ORAL ARGUMENT NOT YET SCHEDULED

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

PUBLIC SERVICE ELECTRIC AND GAS COMPANY, *et al.*,
Petitioners,

v.

FEDERAL ENERGY REGULATORY COMMISSION, Respondent.

Case No. 12-1382

_____

On Petition for Review of Orders of the
Federal Energy Regulatory Commission

_____

PETITIONER BRIEF OF THE PSEG COMPANIES,
THE PPL PJM COMPANIES, AND EXELON CORPORATION
(PJM TRANSMISSION OWNERS)

_____

Jodi L. Moskowitz
General Regulatory Counsel –
Operations and Compliance
PSEG SERVICES CORP.
80 Park Plaza, T-5G
Newark, NJ  07102
(973) 430-6409
jodi.moskowitz@pseg.com

John Lee Shepherd, Jr.
Karis Anne Gong
SKADDEN, ARPS, SLATE,
 MEAGHER & FLOM LLP
1440 New York Avenue, N.W.
Washington, DC 20005-2111
(202) 371-7338
john.shepherd@skadden.com
karis.gong@skadden.com

*Counsel for the PSEG Companies*

January 7, 2013

(Additional counsel are listed in the overleaf.)

John Longstreth
Donald A. Kaplan
William M. Keyser
K&L GATES LLP
1601 K Street
Washington, DC 20006
(202) 778-9000
john.longstreth@klgates.com
don.kaplan@klgates.com
william.keyser@klgates.com

*Counsel for the PPL Companies*

Gary E. Guy
Assistant General Counsel
BALTIMORE GAS & ELECTRIC CO.
2 Center Plaza, Suite 1301
110 West Fayette Street
Baltimore, MD 21201
(410) 470-1337
gary.e.guy@bge.com

*On Behalf of Exelon Corporation*

*CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES*

I.     Parties and Amici.

The parties to this proceeding are as follows:

A.     Petitioners:

The Petitioners in this proceeding are the following:   Public Service Electric and Gas Company, PSEG Power LLC, and PSEG Energy Resources & Trade LLC (together, the "PSEG Companies"); PPL Electric Utilities Corporation; PPL EnergyPlus, LLC; PPL Brunner Island, LLC; PPL Holtwood, LLC; PPL Martins Creek, LLC; PPL Montour, LLC; PPL Susquehanna, LLC; and Lower Mount Bethel Energy, LLC (together, the "PPL Companies"); and Exelon Corporation, including Baltimore Gas and Electric Company, PECO Energy Company, and Commonwealth Edison Company (together, "Exelon").

B.     Respondent:

The Respondent in this proceeding is Federal Energy Regulatory Commission ("FERC" or "the Commission").

C.     Intervenors:

The Intervenors in this proceeding are Jersey Central Power & Light Company, Metropolitan Edison Company, Monongahela Power Company, Pennsylvania Electric Company, The Potomac Edison

Company, Trans-Allegheny Interstate Line Company, and West Penn Power Company (collectively, the "FirstEnergy Companies"), and American Municipal Power, Inc.

D.    Parties Below

In addition to the parties in this case already listed above, the parties in the Commission proceedings below included the following:

1.    Parties in FERC Nos. ER10-253 and EL10-14

Allegheny Power
American Electric Power Service Corporation
Constellation Energy Commodities Group, Inc.
Constellation NewEnergy, Inc.
Constellation Power Source Generation, Inc.
Duquesne Light Company
H-P Energy Resources LLC
LS Power Transmission, LLC
Maryland Public Service Commission
Metropolitan Edison Co.
NextEra Energy Generators
NRG Companies
Old Dominion Electric Cooperative
Pepco Holdings, Inc.
PJM Interconnection, L.L.C.
PJM Power Providers Group
PJM Transmission Owner Group
Primary Power, LLC
Public Service Commission of Maryland
Virginia Electric and Power Company

## 2.    Parties in FERC No. EL10-52

Allegheny Power
Ameren Services Company
American Transmission Company LLC
American Wind Energy Association
Central Transmission, LLC
Dayton Power and Light Company
Dominion Resources Services, Inc.
Duke Energy Corporation
Duquesne Light Company
FirstEnergy Service Company
Green Power Express LP
H-P Energy Resources LLC
Iberdrola Renewables, Inc.
Illinois Commerce Commission
Indiana Utility Regulatory Commission
Invenergy LLC
ITC Great Plains LLC
ITC Midwest LLC
ITC Transmission
Michigan Electric Transmission Company, LLC
MidAmerican Energy Holdings Company
Midwest ISO Transmission Owners
Monitoring Analytics, LLC
New Jersey Board of Public Utilities
NextEra Energy Generators
North Carolina Electric Membership Corporation
NRG Companies
Old Dominion Electric Cooperative
Pennsylvania Public Utility Commission
Pepco Holdings, Inc.
PJM Transmission Owners Group
Primary Power, LLC
PTO Group
Public Service Commission of Maryland
Public Utilities Commission of Ohio
Solar Energy Industries Association

Southern California Edison Company
Xcel Energy Services Inc.

## II.     Rulings Under Review

Petitioners seek review of the following orders of the Federal

Energy Regulatory Commission:

A.    *Primary Power, LLC*, Order on Petition for Declaratory
Order, Docket Nos. ER10-253 and EL10-14, 131 FERC
¶ 61,015 (April 13, 2010);

B.    *Primary Power, LLC*, Order on Rehearing and Clarification,
Docket Nos. ER10-253 and EL10-14, 140 FERC ¶ 61,052
(July 19, 2012);

C.    *Central Transmission, LLC v. PJM Interconnection L.L.C.*,
Order on Complaint, Docket No. EL10-52, 131 FERC
¶ 61,243 (June 17, 2010); and

D.    *Central Transmission, LLC v. PJM Interconnection L.L.C.*,
Order on Rehearing, Docket No. EL10-52, 140 FERC
¶ 61,053 (July 19, 2012).

## III.    Related Cases

The orders under review in this proceeding have not previously

been before this Court, or any court.

One of the issues presented in this case is whether the

Commission has jurisdiction under the Federal Power Act to condition

or limit zonal transmission owners' right of first refusal to construct

transmission facilities within their respective franchised transmission

iv

zones. That same jurisdictional question is also one of several issues before the court on review of the Commission's general rulemaking in *Transmission Planning and Cost Allocation by Transmission Owning and Operating Public Utilities*, Order No. 1000, 136 FERC ¶ 61,051 (2011), *order on reh'g and clarification*, Order No. 1000-A, 139 FERC ¶ 61,132 (2012). Fifteen consolidated petitions for review of Order Nos. 1000 and 1000-A are currently pending before this Court in *South Carolina Public Service Authority v. FERC*, No. 12-1232 (D.C. Cir. filed May 25, 2012). However, the context in which the jurisdictional question arises differs between the two cases. In this case, the Commission held that the tariff of a particular Regional Transmission Organization—PJM Interconnection, L.L.C.—does not contain a right of first refusal for transmission owners to build economic transmission projects within their own transmission zones. In Order No. 1000, by contrast, the Commission ordered federal rights of first refusal to be removed from FERC-jurisdictional tariffs.

Petitioners are not aware of any other related proceedings before this Court or any other court.

Respectfully submitted,

*/s/ John Lee Shepherd, Jr.*

John Longstreth
Donald A. Kaplan
William M. Keyser
K&L GATES LLP
1601 K Street
Washington, DC 20006
(202) 778-9000
john.longstreth@klgates.com
don.kaplan@klgates.com
william.keyser@klgates.com

*Counsel for the PPL Companies*

Gary E. Guy
Assistant General Counsel
BALTIMORE GAS AND
  ELECTRIC COMPANY
2 Center Plaza, Suite 1301
110 West Fayette Street
Baltimore, MD 21201
(410) 470-1337
gary.e.guy@bge.com

*On Behalf of Exelon Corporation*

January 7, 2013

John Lee Shepherd, Jr.
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
1440 New York Avenue, N.W.
Washington, DC 20005-2111
(202) 371-7338
john.shepherd@skadden.com

Jodi L. Moskowitz
General Regulatory Counsel –
Operations and Compliance
PSEG SERVICES CORP.
80 Park Plaza, T-5G
Newark, NJ  07102
(973) 430-6409
jodi.moskowitz@pseg.com

*Counsel for the PSEG Companies*

## CORPORATE DISCLOSURE STATEMENT
## OF THE PSEG COMPANIES

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Fed. R. App. P. 26.1, and Rule 26.1 of the General Rules of the United States Court of Appeals for the District of Columbia Circuit, Public Service Enterprise Group Incorporated ("PSEG"), Public Service Electric and Gas Company ("PSE&G"), PSEG Power LLC ("PSEG Power"), and PSEG Energy Resources & Trade LLC ("PSEG ER&T") (collectively the "PSEG Companies") hereby provide this corporate disclosure statement in connection with the Petition for Review in the above-captioned matter.

1.    PSE&G and PSEG Power are each wholly owned direct subsidiaries of PSEG.  PSEG ER&T is a wholly owned indirect subsidiary of PSEG.  The principal and executive offices of PSEG, PSE&G, PSEG Power and PSEG ER&T are located at 80 Park Plaza, Newark, New Jersey 07102.

2.    PSEG is an exempt public utility holding company incorporated under the laws of the State of New Jersey.  PSEG is engaged in, among other things, the generation, transmission, and sale of electric energy through its subsidiaries.

3.      PSE&G is a public utility company organized under the laws of the State of New Jersey.  PSE&G is presently engaged in, among other things, the transmission and distribution of electricity and the distribution of natural gas in New Jersey.  PSE&G owns transmission facilities in PJM Interconnection, L.L.C. ("PJM").

4.      PSEG Power, a Delaware limited liability company, is a wholesale energy supply company that integrates its generation asset operations with its wholesale energy, fuel supply, energy trading and marketing, and risk management functions through three principal subsidiaries: (i) PSEG Nuclear LLC ("PSEG Nuclear"), which owns and operates nuclear generating stations; (ii) PSEG Fossil LLC ("PSEG Fossil"), which develops, owns, and operates domestic fossil-fuel fired and other non-nuclear generating stations; and, (iii) PSEG ER&T, which is described below.

5.      PSEG ER&T, a Delaware limited liability company, sells power and energy and certain ancillary services at market-based rates. PSEG ER&T markets the capacity and production of PSEG Nuclear's and PSEG Fossil's generating stations, manages the commodity price risks and market risks related to generation, and provides gas supply

services.     PSEG ER&T is engaged in extensive asset-based energy trading operations throughout the Northeast.

6.     PSEG has publicly-held common stock outstanding.  PSE&G has publicly-held debt securities outstanding.    PSE&G Transition Funding LLC and PSE&G Transition Funding II LLC, each a wholly-owned subsidiary of PSE&G, have publicly-held debt securities outstanding.  PSEG Power has publicly-held debt securities outstanding.

Respectfully submitted,

Tamara Linde
Vice President - Regulatory
Jodi Moskowitz
General Regulatory Counsel -
Operations and Compliance
PSEG SERVICES CORPORATION
80 Park Plaza - T5G
Newark, New Jersey 07102
(973) 430-8058
(973) 430-6409
tamara.linde@PSEG.com
jodi.moskowitz@PSEG.com

*/s/ John L. Shepherd, Jr.*John L. Shepherd, Jr.
Karis Anne Gong
SKADDEN, ARPS, SLATE,
 MEAGHER & FLOM LLP
1440 New York Avenue, N.W.
Washington, DC 20005
(202) 371-7338
john.shepherd@skadden.com
karis.gong@skadden.com

*Counsel for the PSEG Companies*

January 7, 2013

## CORPORATE DISCLOSURE STATEMENT
## OF THE PPL COMPANIES

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, and District of Columbia Circuit Rule 26.1, PPL Electric Utilities Corporation ("PPL Electric"); PPL EnergyPlus, LLC ("PPL EnergyPlus"); PPL Brunner Island, LLC ("PPL Brunner Island"); PPL Holtwood, LLC ("PPL Holtwood"); PPL Martins Creek, LLC ("PPL Martins Creek"); PPL Montour, LLC ("PPL Montour"); PPL Susquehanna, LLC ("PPL Susquehanna"); and Lower Mount Bethel Energy, LLC ("Lower Mount Bethel Energy") (collectively, "PPL Companies") submit the following required Disclosure Statement:

PPL Electric is a wholly owned direct subsidiary of PPL Corporation.  PPL EnergyPlus, PPL Brunner Island, PPL Holtwood, PPL Martins Creek, PPL Montour, PPL Susquehanna, and Lower Mount Bethel Energy are wholly owned indirect subsidiaries of PPL Corporation.  The shares of PPL Corporation are publicly traded. No other publicly held company has a 10% or greater ownership interest in the PPL Companies.

Pursuant to the requirement of Circuit Rule 26.1(b) that movants provide a statement of general nature and purpose relevant to the litigation, the PPL Companies hereby state as follows:

PPL Electric is a Pennsylvania Corporation and owner of transmission and distribution facilities located within PJM Interconnection, L.L.C. ("PJM"). PPL Electric is a provider of last resort in central eastern Pennsylvania under Pennsylvania's Electric Generation Customer Choice and Competition Act, 66 Pa.C.S. § 2801, *et seq*.

PPL EnergyPlus is a Pennsylvania limited liability company and a power marketer that sells energy, capacity and certain ancillary services at wholesale and retail. PPL EnergyPlus sells energy, capacity and ancillary services and is a retail supplier in PJM.

PPL Brunner Island, PPL Holtwood, PPL Martins Creek, PPL Montour, PPL Susquehanna, and Lower Mount Bethel Energy are Delaware limited liability companies primarily engaged in the ownership and operation of generating facilities in PJM. PPL Brunner Island, PPL Holtwood, PPL Martins Creek, PPL Montour, PPL

Susquehanna, and Lower Mount Bethel Energy have authority to sell

energy, capacity and ancillary services at market-based rates.

Respectfully submitted,

*/s/ Donald A. Kaplan*
Donald A. Kaplan
John Longstreth
K&L Gates LLP
1601 K Street
Washington, DC 20006
Phone: (202) 778-9000
Fax: (202) 778-9100
don.kaplan@klgates.com
john.longstreth@klgates.com

*Counsel for the PPL Companies*

Dated:  January 7, 2013

## CORPORATE DISCLOSURE STATEMENT
## OF EXELON CORPORATION

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Fed. R. App. P. 26.1, and Rule 26.1 of the General Rules of the United States Court of Appeals for the District of Columbia Circuit, Exelon Corporation ("Exelon") submits the following disclosure statement.

Exelon is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania and has its principal offices at 10 South Dearborn Street, Chicago, Illinois 60603. Exelon has no parent company, and no publicly-held company has a 10 percent or greater ownership interest in Exelon. Exelon is engaged in the purchase, transmission, distribution, and sale of electricity through its franchised electric utility subsidiaries, Commonwealth Edison Company, Commonwealth Edison Company of Indiana, Inc., PECO Energy Company, and Baltimore Gas and Electric Company, all of which are electric utilities under the Federal Power Act subject to regulation by the Federal Energy Regulatory Commission.

Respectfully submitted,

*/s/ Gary E. Guy*
Gary E. Guy
Assistant General Counsel
Baltimore Gas and Electric Company
2 Center Plaza, Suite 1301
110 West Fayette Street
Baltimore, Maryland 21201
Tel.: (410) 470-1337
Fax: (443) 213-3206
Email: gary.e.guy@bge.com

*On Behalf of Petitioner Exelon Corporation*

Dated: January 7, 2013

# TABLE OF CONTENTS

Certificate as to Parties, Rulings, and Related Cases ...............................i

Corporate Disclosure Statements ...........................................................vii

Table of Contents .....................................................................................xv

Table of Authorities..................................................................................xix

Glossary ....................................................................................................xxv

Jurisdictional Statement..............................................................................1

Statement of the Issues................................................................................2

Statutory Addendum....................................................................................3

Statement of Facts ........................................................................................3

    I.     Statutory and Regulatory Background .......................................3

        A. The Federal Power Act and Transmission Siting Authority ......3

        B. Regional Transmission Organizations .........................................5

    II.    The PJM Regional Transmission Expansion Planning
        Protocol ........................................................................................6

    III.   The Proceedings Below................................................................8

        A. The Primary Power Proceeding..................................................8

            1. The Petition...........................................................................8

            2. Protest of the PJM Transmission Owners Group ...............10

            3. Initial Order .......................................................................12

            4. Requests for Rehearing.......................................................14

B. The Central Transmission Proceeding ...................................... 19

  1. Central Transmission's Complaint ...................................... 19

  2. Protest of the PJM Transmission Owners ............................ 20

  3. Complaint Order ......................................................... 22

  4. Request for Rehearing .................................................. 23

IV.  FERC's Orders on Rehearing .................................................. 23

Summary of the Argument ...................................................... 25

Standing ........................................................................... 28

Argument ........................................................................... 28

I.  Standard of Review ........................................................ 28

II.  The FPA Does Not Permit FERC to Mandate the
     Construction of Transmission Lines, Much Less Who Will
     Build Them, and FERC May Not Direct PJM to Exercise
     Authority That FERC Itself Lacks .......................................... 32

III.  FERC's Interpretation of PJM's Governing Agreements Is
      Arbitrary and Capricious .................................................... 40

   A. FERC's Expansive Interpretation of the Owners Agreement
      Conflicts with the Plain Meaning of Its Provisions ................. 43

      1. Section 4.2—Obligation to Build .......................................... 45

      2. Section 5.2—Facility Rights ................................................ 50

      3. Section 5.4—Federal Power Act Rights ................................. 52

      4. Section 7—Section 205 Rights and Zone Modifications ....... 53

B. FERC Irrationally Interprets the RTEP Protocol in PJM's Operating Agreement to Provide Superior Rights to Non-Contracting Parties ................................................................. 55

    1. Section 1.5.6(f) Requires PJM to Designate an Incumbent Transmission Owner to Build New Economic Projects in Its Zone .............................................. 57

    2. Section 1.7(d) of the PJM Operating Agreement Acknowledges That Incumbent Transmission Owners Have a Right of First Refusal to Build Economic Transmission Projects ............................................. 62

    3. Section 1.5.7(c)(iii) Does Not Vitiate Incumbent Transmission Owners' Right to Build, or Decline to Build, Economic Projects Within Their Respective Zones ................................................................... 65

    4. FERC Erred in Holding That a Non-Incumbent Entity Is Eligible for Cost-Based Rates Under Section 1.5.7(c)(iii) ....................................................... 68

Conclusion ............................................................... 73

ADDENDUM

Administrative Procedure Act Section 10(e), 5 U.S.C. § 706 ............... A-1

Federal Power Act Section 201, 16 U.S.C. § 824 ............................... A-2

Federal Power Act Section 202, 16 U.S.C. § 824a ............................. A-6

Federal Power Act Section 203, 16 U.S.C. § 824b ............................. A-10

Federal Power Act Section 205, 16 U.S.C. § 824d ............................ A-13

Federal Power Act Section 206, 16 U.S.C. § 824e ............................. A-17

Federal Power Act Section 210, 16 U.S.C. § 824i ............................. A-21

Federal Power Act Section 211, 16 U.S.C. § 824j ............................ A-24

Federal Power Act Section 216, 16 U.S.C. § 824p ............................ A-28

Federal Power Act Section 313, 16 U.S.C. § 825*l* ............................... A-38

Natural Gas Act Section 7, 15 U.S.C. § 717f ...................................... A-40

220 Illinois Compiled Statutes 5/8-406 ............................................. A-44

Maryland Code Annotated, Public Utility Companies § 7-207 .......... A-48

New Jersey Statutes Annotated § 40:55D-19 .................................... A-54

Ohio Revised Code § 4906.03 ............................................................. A-56

Ohio Revised Code § 4906.04 ............................................................. A-59

52 Pennsylvania Consolidated Statutes § 57.76 ................................ A-60

# TABLE OF AUTHORITIES

*FEDERAL CASES*                                         *PAGE(S)*

*\*Altamont Gas Transmission Co. v. FERC,*
   92 F.3d 1239 (D.C. Cir. 1996) ...................................................... 37-38

*Ameren Servs. Co. v. FERC,*
   330 F.3d 494 (D.C. Cir. 2003) ............................................................ 31

*American Library Ass'n v. FCC,*
   406 F.3d 689 (D.C. Cir. 2005) ............................................................ 30

*Associated Gas Distribs. v. FERC,*
   810 F.2d 226 (D.C. Cir. 1987) ............................................................ 72

*\*Atlantic City Elec. Co. v. FERC,*
   295 F.3d 1 (D.C. Cir. 2002) ......................... 6, 18, 26, 32, 35-36, 37, 40

*\*California Indep. Sys. Operator Corp. v. FERC,*
   372 F.3d 395 (D.C. Cir. 2004) ...................................... 4, 18, 32, 34-35

*Canadian Ass'n of Petroleum Producers v. FERC,*
   254 F.3d 289 (D.C. Cir. 2001) ............................................................ 40

*Chemical Waste Mgmt., Inc. v. EPA,*
   873 F.2d 1477 (D.C. Cir. 1989) .......................................................... 31

*Chevron, U.S.A., Inc. v. NRDC,*
   467 U.S. 837 (1984) ............................................................... 29, 30, 31

*Exxon Mobil Corp. v. FERC,*
   571 F.3d 1208 (D.C. Cir. 2009) .......................................................... 43

*Frost v. Corp. Comm'n of Oklahoma,*
   278 U.S. 515 (1929) .......................................................................... 28

*Louisiana Pub. Serv. Comm'n v. FCC,*
   476 U.S. 355 (1986) .......................................................................... 32

*Maryland Pub. Serv. Comm'n v. FERC,*
   632 F.3d 1283 (D.C. Cir. 2011) ............................................................ 6

*Michigan v. EPA,*
   268 F.3d 1075 (D.C. Cir. 2001) .......................................................... 32

\*Authorities upon which we chiefly rely are marked with an asterisk.

*Morgan Stanley Capital Grp. Inc. v. Pub. Util. Dist. No. 1,*
554 U.S. 527 (2008); ........................................................ 5, 6

*Motion Picture Ass'n of Am., Inc. v. FCC,*
309 F.3d 796 (D.C. Cir. 2002) ............................................ 30

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
463 U.S. 29 (1983) ............................................................ 29

*\*Northern States Power Co. v. FERC,*
176 F.3d 1090 (8th Cir. 1999) ........................................ 37-38

*Panhandle E. Pipe Line Co. v. FERC,*
613 F.2d 1120 (D.C. Cir. 1979) .......................................... 43

*Pennzoil Co. v. FERC,*
645 F.2d 360 (5th Cir. 1981) .............................................. 72

*Pennzoil Co. v. FERC,*
789 F.2d 1128 (5th Cir. 1986) ............................................ 72

*\*Piedmont Envtl. Council v. FERC,*
558 F.3d 304 (4th Cir. 2009) ........................................... 4, 33

*\*PSEG Energy Res. & Trade LLC v. FERC,*
665 F.3d 203 (D.C. Cir. 2011) ........................... 29, 40, 60, 63

*PPL Wallingford Energy LLC v. FERC,*
419 F.3d 1194 (D.C. Cir. 2005) ...................................... 29, 40

*Public Util. Dist. No. 1 v. FERC,*
272 F.3d 607 (D.C. Cir. 2001) ........................................ 5, 40

*\*Southern Cal. Edison Co. v. FERC,*
502 F.3d 176 (D.C. Cir. 2007) ...................................... 31, 73

*\*Transmission Agency of N. Cal. v. FERC,*
495 F.3d 663 (D.C. Cir. 2007) ........................................ 29-30

*Transmission Agency of N. Cal. v. FERC,*
628 F.3d 538 (D.C. Cir. 2010) ............................................ 29

*\*United States v. Mead Corp.,*
533 U.S. 218 (2001) ...................................................... 30-31

*Village of Bergen v. FERC,*
33 F.3d 1385 (D.C. Cir. 1994) ............................................ 30

\*Authorities upon which we chiefly rely are marked with an asterisk.

*STATE CASES*

*Morris Cnty. Transfer Station, Inc. v. Frank's Sanitation Serv., Inc.,*
617 A.2d 291 (N.J. App. Div. 1992) ..................................................28

*In re Public Serv. Elec. & Gas Co.,*
173 A.2d 233 (N.J. 1961)...............................................................4 n.2

*Energy Conservation Council v. Pub. Util. Comm'n,*
25 A.3d 440 (Comm. Ct. Pa. 2011).................................................4 n.2

*FERC ADMINISTRATIVE ORDERS*

*Central Transmission, LLC v. PJM Interconnection, L.L.C.,*
131 FERC ¶ 61,243 (2010) .......................................................1, 22-23

*Central Transmission, LLC v. PJM Interconnection, L.L.C.,*
140 FERC ¶ 61,053 (2012) .......................................................1, 23-24

*PacifiCorp,*
72 FERC ¶ 61,087 (1995) ....................................................................4

*Primary Power, LLC,*
131 FERC ¶ 61,015 (2010) ................................................ 1, 12, 52, 58

*Primary Power, LLC,*
140 FERC ¶ 61,052 (2012) ..... 1, 24, 42, 47, 51-55, 58-62, 64-66, 68-69

*Regional Transmission Organizations,* Order No. 2000,
FERC Stats. & Regs., Regs Preambles 31,089 (1999).......................5

*Regional Transmission Organizations,* Order No. 2000-A,
FERC Stats & Regs., Regs. Preambles ¶ 31,092 (2000) ....................5

*Transmission Planning and Cost Allocation by Transmission
Owning and Operating Pub. Utils.,* Order No. 1000,
FERC Stats. & Regs. ¶ 31,323 (2011).........................................56 n.6

*Transmission Planning and Cost Allocation by Transmission
Owning and Operating Public Utilities,* Order No. 1000-A,
139 FERC ¶ 61,132 (2012).........................................................56 n.6

*Transmission Planning and Cost Allocation by Transmission
Owning and Operating Public Utilities,* Order No. 1000-B,
141 FERC ¶ 61,044 (2012).........................................................56 n.6

*Authorities upon which we chiefly rely are marked with an asterisk.

*STATE ADMINISTRATIVE ORDERS*

*American Transmission Sys., Inc.*,
2012 WL 6705988 (Ohio P.U.C. Dec. 17, 2012) ................................ 5 n.2

*Commonwealth Edison Co.*,
    2012 WL 1825354 (Ill. Comm. Comm'n May 16, 2012) ............... 5 n.2

*Potomac Edison Co.*,
284 P.U.R. 4th 504 (Md. Pub. Serv. Comm'n 2010) .......................... 5 n.2

*Public Serv. Elec. & Gas Co.*,
    2012 WL 3646777 (N.J. Bd. Reg. Comm'rs June 18, 2012) .......... 4 n.2

*FEDERAL STATUTES AND REGULATIONS*

Administrative Procedure Act Section 10(e), 5 U.S.C. § 706(2) ...... 2-3, 28

Federal Power Act Section 201, 16 U.S.C. § 824 ...................... 2, 3, 34 n.4

Federal Power Act Section 202, 16 U.S.C. § 824a ..................... 36, 37, 40

Federal Power Act Section 203, 16 U.S.C. § 824b ................................ 36

Federal Power Act Section 205, 16 U.S.C. § 824d ... 2, 3, 36, 37, 39-40, 53

*Federal Power Act Section 206, 16 U.S.C. § 824e

    ......................................................... 2, 3, 11, 19-20, 39-40, 42, 43, 73

Federal Power Act Section 210, 16 U.S.C. § 824i ............................ 39 n.5

Federal Power Act Section 211, 16 U.S.C. § 824j ............................ 39 n.5

Federal Power Act Section 216, 16 U.S.C. § 824p ........................ 2, 33, 70

Federal Power Act Section 313, 16 U.S.C. § 825*l* .............................. 1, 14

Natural Gas Act Section 7, 15 U.S.C. § 717f(a) ................................ 38-39

*STATE STATUTES*

52 Pa. Code §57.76(a) ........................................................................ 4 n.2

220 ILCS 5/8-406(b) .......................................................................... 4 n.2

Md. Code Ann. Pub. Util. Cos. Art. §7-207(b)(3) ................................ 5 n.2

*Authorities upon which we chiefly rely are marked with an asterisk.

N.J.S.A. 40:55D-19 ................................................................... 4 n.2

Ohio Rev. Code §§4906.03 ...................................................... 4 n.2

Ohio Rev. Code §§4906.04 ...................................................... 4 n.2

*TARIFF PROVISIONS*

PJM Consolidated Owners Agreement Preamble ................................... 47

PJM Consolidated Owners Agreement Section 1.27 .............................. 47

PJM Consolidated Owners Agreement Section 1.28 ....................... 44, 47

PJM Consolidated Owners Agreement Section 1.32 ....................... 45, 55

PJM Consolidated Owners Agreement Section 4.2 ................................ 45

*PJM Consolidated Owners Agreement Section 4.2.1

.......................................................... 39, 45-46, 47, 48, 49, 63, 67 n.8

PJM Consolidated Owners Agreement Section 4.2.2 ................ 46, 48, 63

PJM Consolidated Owners Agreement Section 4.2.3 ...................... 46, 49

PJM Consolidated Owners Agreement Section 5.2 ......................... 50, 51

PJM Consolidated Owners Agreement Section 5.4 ................................ 52

PJM Consolidated Owners Agreement Section 5.6 .................... 50, 52, 59

PJM Consolidated Owners Agreement Section 7 .................................. 53

PJM Consolidated Owners Agreement Section 7.1 ............................... 53

PJM Consolidated Owners Agreement Section 7.1.1 ............................ 53

PJM Consolidated Owners Agreement Section 7.1.3 ............................ 53

PJM Consolidated Owners Agreement Section 7.3.4 ............................ 54

PJM Consolidated Owners Agreement Section 7.3.5 ............................ 54

PJM Consolidated Owners Agreement Section 7.4 ......................... 53, 54

PJM Consolidated Owners Agreement Attachment A .......................... 44

PJM Operating Agreement, Schedule 6, Section 1.1 ............................... 7

PJM Operating Agreement, Schedule 6, Section 1.5.3 ............................ 7

PJM Operating Agreement, Schedule 6, Section 1.5.4 ............................ 7

*Authorities upon which we chiefly rely are marked with an asterisk.

PJM Operating Agreement, Schedule 6, Section 1.5.6.....................34 n.4

PJM Operating Agreement, Schedule 6, Section 1.5.6(a) .......................7

PJM Operating Agreement, Schedule 6, Section 1.5.6(d) ...........60-61, 62

*PJM Operating Agreement, Schedule 6, Section 1.5.6(f)

........7-8, 12-13, 16, 17, 26, 27, 47-48, 57, 58, 59, 60, 61, 67 n.8, 69, 71

*PJM Operating Agreement, Schedule 6, Section 1.5.6(g)

...................................................................65, 66, 67, 68, 69, 70, 71

PJM Operating Agreement, Schedule 6, Section 1.5.7

............................................................ 34 n.4, 46, 47, 60, 61, 62, 68

PJM Operating Agreement, Schedule 6, Section 1.5.7(c)(iii)

...................................................................12, 56, 65, 66, 67, 68, 69

*PJM Operating Agreement, Schedule 6, Section 1.5.7(j) ... 66, 67, 69, 70

PJM Operating Agreement, Schedule 6, Section 1.6....................8, 65, 66

PJM Operating Agreement, Schedule 6, Section 1.6(a) .........................66

PJM Operating Agreement, Schedule 6, Section 1.7............ 62, 63, 65, 66

PJM Operating Agreement, Schedule 6, Section 1.7(a) .........................39

*PJM Operating Agreement, Schedule 6, Section 1.7(d)

.................................................................. 61, 62, 64 n.7, 66

PJM Tariff Attachment H..................................................................44-45

PJM Tariff Attachment T......................................................................45

PJM Tariff Section 1.18E......................................................................10

PJM Tariff Schedule 7.................................................................... 44, 45

PJM Tariff Schedule 8.................................................................... 44, 45

PJM Tariff Schedule 12........................................................ 20, 23, 42, 54

PJM Tariff Schedule 14.........................................................................45

PJM Tariff Schedule 16.........................................................................45

*Authorities upon which we chiefly rely are marked with an asterisk.

xxiv

# GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| Commission | Federal Energy Regulatory Commission, the Respondent. |
| Complaint | *Central Transmission, LLC v. PJM Interconnection, L.L.C.*, FERC No. EL10-52, Complaint and Request for Expedited Action of Central Transmission, LLC (Mar. 25, 2010), JA____-____ |
| Complaint Order | *Central Transmission, LLC v. PJM Interconnection, L.L.C.*, 131 FERC ¶ 61,243 (2010), JA____-____ |
| Complaint Rehearing Order | *Central Transmission, LLC v. PJM Interconnection, L.L.C.*, 140 FERC ¶ 61,053 (2012), JA____-____ |
| CT Answer I | *Central Transmission, LLC v. PJM Interconnection, L.L.C.*, FERC No. EL10-52, Motion for Leave to Answer and Answer of Central Transmission, LLC (May 13, 2010), JA____-____ |
| CT Answer II | *Central Transmission, LLC v. PJM Interconnection, L.L.C.*, FERC No. EL10-52, Motion for Leave to Answer and Answer of Central Transmission, LLC (Aug. 2, 2010), JA____-____ |
| CTOA | PJM Consolidated Transmission Owners Agreement, JA____-____ |
| FERC | Federal Energy Regulatory Commission, the Respondent |
| FPA | Federal Power Act |

| | |
|---|---|
| ISA | Interconnection Service Agreement |
| Linden | Linden VFT, LLC |
| Neptune | Neptune Regional Transmission System, LLC |
| OA | PJM Operating Agreement, JA____-____ |
| Operating Agreement | PJM Operating Agreement, JA____-____ |
| Order | *Primary Power, LLC*, 131 FERC ¶ 61,015 (2010), JA____-___ |
| Owners Agreement | PJM Consolidated Transmission Owners Agreement, JA____-____ |
| Petition | *Primary Power, LLC*, FERC Nos. ER10-253 and EL10-14, Petition for Declaratory Order Requesting Incentive Rate Treatment, Acceptance of Rate of Return, and Certain Related Determinations for the Grid Plus Transmission System (Nov. 10, 2009), JA____-____ |
| PJM | PJM Interconnection, L.L.C. |
| PJM Intervention | Motion to Intervene and Comments of PJM Interconnection, L.L.C., *Primary Power, LLC*, FERC No. ER10-253, EL10-14 (Dec. 11, 2009), JA___-____ |
| PJM Tariff | PJM Open Access Transmission Tariff |
| PP Answer I | *Primary Power, LLC*, FERC Nos. ER10-253 and EL10-14, Primary Power, LLC Answer to Protests and Comments (Mar. 17, 2010), JA____-____ |

| | |
|---|---|
| PP Answer II | *Primary Power, LLC*, FERC Nos. ER10-253 and EL10-14, Answer of Primary Power, LLC to Requests for Rehearing or Clarification (Jun. 14, 2010), JA____-____ |
| PSEG CT Rehearing | *Central Transmission, LLC v. PJM Interconnection, L.L.C.*, FERC No. EL10-52, Request for Rehearing of the PSEG Companies (Jul. 19, 2010), JA____-____ |
| PSEG Rehearing | *Primary Power, LLC*, FERC Nos. ER10-253 and EL10-14, Request for Rehearing and Clarification of the PSEG Companies (May 13, 2010), JA____-____ |
| PTO Answer | *Primary Power, LLC,* FERC Nos. ER10-253 and EL10-14, Motion for Leave to Answer and Limited Answer of the PJM Transmission Owner Group (Jan. 6, 2010), JA____-____ |
| PTO CT Protest | *Central Transmission, LLC v. PJM Interconnection, L.L.C.*, FERC No. EL10-52, PJM Transmission Owners Group Comments and Protest to Complaint Filed by Central Transmission, LLC (Apr. 28, 2010), JA____-____ |
| PTO Protest | *Primary Power, LLC*, FERC Nos. ER10-253 and EL10-14, Protest of the PJM Transmission Owner Group (Dec. 11, 2009), JA____-____ |
| PTO Rehearing | *Primary Power, LLC, FERC* Nos. ER10-253 and EL10-14, Request for Rehearing of the PJM Transmission Owner Group (May 13, 2010), JA____-____ |
| Rehearing Order | *Primary Power, LLC*, 140 FERC ¶ 61,052 (2012), JA____-____ |

| | |
|---|---|
| ROFR | Right of First Refusal |
| RTEP | Regional Transmission Expansion Plan |
| RTEP Protocol | Schedule 6 of the Operating Agreement, JA____-____ |
| RTO | Regional Transmission Organization |
| Tariff | PJM Open Access Transmission Tariff |
| Transmission Owners | PJM Transmission Owners Group |
| Zone | Areas within PJM defined in Attachment J of the PJM Operating Agreement that are generally coterminous with the retail service areas of the Transmission Owners. |

## JURISDICTIONAL STATEMENT

Petitioners are Transmission Owner members of the Regional Transmission Organization ("RTO") operated by PJM Interconnection, L.L.C ("PJM").   In its orders below, the Federal Energy Regulatory Commission ("FERC" or "Commission") held that PJM's governing agreements do not provide PJM Transmission Owners with a right of first refusal ("ROFR") to build economic transmission expansion or enhancement projects within their respective transmission zones.  *See Primary Power, LLC*, 131 FERC ¶ 61,015 (Apr. 13, 2010) ("Order"), *reh'g denied* 140 FERC ¶ 61,052 (Jul. 19, 2012) ("Rehearing Order"); *Central Transmission, LLC v. PJM Interconnection, L.L.C.*, 131 FERC ¶ 61,243 (Jun. 17, 2010) ("Complaint Order"), *reh'g denied* 140 FERC ¶ 61,053 (Jul. 19, 2012) ("Complaint Rehearing Order").   Petitioners timely filed requests for rehearing of the Declaratory Order on May 15, 2010 and the Complaint Order on July 19, 2010.   Petitioners timely petitioned for judicial review of both rehearing orders on September 17, 2012.   This Court has jurisdiction to review the Commission's orders under Federal Power Act ("FPA") section 313(b), 16 U.S.C. § 825*l*(b).

## STATEMENT OF THE ISSUES

The central issue in this case is whether an incumbent zonal Transmission Owner in PJM has a right of first refusal under PJM's governing agreements to build economically-driven transmission facility expansions or upgrades within its own Zone.[1]  FERC held below that PJM may designate third party developers to build and own such projects, and to receive cost-of-service compensation for them, as long as PJM includes the new project in its Regional Transmission Expansion Plan ("RTEP").  The questions presented are:

(1)     Whether FERC exceeded its authority under the FPA, *see* 16 U.S.C. §§ 824, 824d, 824e, 824p, when it purported to abrogate zonal Transmission Owners' right of first refusal to construct transmission facilities within their respective transmission Zones; and

(2)     Whether FERC's interpretation of PJM's governing agreements contrary to the understanding of the contracting parties is

---

[1]     A zonal Transmission Owner in PJM is, or is affiliated with, a traditional utility responsible for providing retail distribution service to customers within a state-franchised service area that is generally coterminous with its PJM transmission Zone.  When Transmission Owners contract to join PJM, they retain ownership of their transmission facilities, but allow PJM to exercise operational control of their facilities to permit centralized operation of the multi-state transmission grid.

arbitrary, capricious, and otherwise unlawful under section 10(e) of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2).

## STATUTORY ADDENDUM

An addendum attached to this brief reproduces the text of the statutory provisions discussed herein.

## STATEMENT OF FACTS

## I.    STATUTORY AND REGULATORY BACKGROUND

### A.    The Federal Power Act and Transmission Siting Authority

Section 201 of the FPA provides FERC with exclusive jurisdiction to regulate rates for "the transmission of electric energy in interstate commerce and the sale of such energy at wholesale."  16 U.S.C. § 824(a). FPA section 205 directs FERC to ensure rates within its jurisdiction are "just and reasonable," *id.* § 824d, and it has authority under FPA section 206, on "its own motion or upon complaint," to change a rate that is "unjust, unreasonable, unduly discriminatory or preferential." *Id.* § 824e(a).  However, FERC's authority "to assess the justness and reasonableness of practices affecting rates of electric utilities is limited to those methods or ways of doing things on the part of the utility that directly affect the rate or are closely related to the rate, not all those

remote things beyond the rate structure that might in some sense indirectly or ultimately do so." *California Indep. Sys. Operator Corp. v. FERC*, 372 F.3d 395, 403 (D.C. Cir. 2004) (*CAISO*); *id.* at 398-99.

"It is well-settled that the Commission does not have authority over the siting and construction of electric transmission facilities that are not part of licensed hydroelectric projects." *PacifiCorp*, 72 FERC ¶ 61,087 at 61,488 & n.3 (1995) (citing cases). "The states have traditionally assumed all jurisdiction to approve or deny permits for the siting and construction of electric transmission facilities." *Piedmont Envtl. Council v. FERC*, 558 F.3d 304, 310 (4th Cir. 2009). Indeed, transmission siting is actively regulated by all of the states in which Petitioners and their supporting intervenors operate:  New Jersey (PSEG & FirstEnergy), Pennsylvania (Exelon, FirstEnergy, PPL), Illinois (Exelon), Maryland (Exelon), Ohio (FirstEnergy), and West Virginia (First Energy).[2]

---

[2]     *See, e.g.*, *In re Public Serv. Elec. & Gas Co.*, 173 A.2d 233 (N.J. 1961) (defining state siting authority under N.J.S.A. 40:55D-19); *Public Serv. Elec. & Gas Co*., 2012 WL 3646777 (N.J. Bd. Reg. Comm'rs. Jun. 18, 2012) (approving project designated by PJM); *Energy Conservation Council v. Pub. Util. Comm'n*, 25 A.3d 440 (Comm. Ct. Pa. 2011) (affirming state board's approval, pursuant to 52 Pa. Code § 57.76(a), of a project designated by PJM); 220 ILCS 5/8-406(b) (requiring certificate

## B.  Regional Transmission Organizations

PJM is a Regional Transmission Organization, or RTO, established under FERC's Order No. 2000 rulemaking.  *See Regional Transmission Organizations*, Order No. 2000, 65 Fed. Reg. 810, FERC Stats. & Regs., Regs. Preambles 31,089 (1999), *order on reh'g*, Order No. 2000-A, FERC Stats. & Regs., Regs. Preambles ¶ 31,092 (2000), *aff'd sub nom. Public Util. Dist. No. 1 v. FERC*, 272 F.3d 607 (D.C. Cir. 2001).  RTOs are voluntary organizations of utilities promoted by FERC to separate transmission ownership from control and to promote efficient coordination by combining multiple utility power grids into a single transmission system.  *See, e.g.*, *Morgan Stanley Capital Grp. Inc. v. Pub. Util. Dist. No. 1*, 554 U.S. 527, 536-37 (2008).  PJM serves a mid-Atlantic and Midwest region including thirteen states and the District of Columbia over a territory that extends from New Jersey to

---

to construct transmission lines); *Commonwealth Edison Co.*, 2012 WL 1825354 (Ill. Comm. Comm'n May 16, 2012) (approving transmission modifications based on PJM studies); Md. Code Ann. Pub. Util. Cos. Art. § 7-207(b)(3) (requiring certificate for transmission lines over 69kV); *Potomac Edison Co.*, 284 P.U.R. 4th 504 (Md. Pub. Serv. Comm'n 2010) (finding utility proper applicant for PJM-designated project); Ohio Rev. Code §§ 4906.03-.04 (requiring Ohio Power Siting Board approval for facilities over 125 kV); *Am. Transmission Sys., Inc.*, 2012 WL 6705988 (Ohio P.U.C. Dec. 17, 2012) (issuing certificate for project identified in PJM's 2011 RTEP).

Illinois and from Pennsylvania to North Carolina.  *See Maryland Pub. Serv. Comm'n v. FERC*, 632 F.3d 1283, 1284 (D.C. Cir. 2011).

RTOs do not own transmission or generation facilities.  Instead, they exercise functional control over transmission facilities owned by member utilities, administer a centralized energy market on behalf of their member utilities, and dispatch generation resources in an economically efficient and reliable manner to meet regional demand. *See, e.g.*, *Morgan Stanley*, 554 U.S. at 536-37.  An RTO provides transmission service using facilities ceded to its functional control by its member transmission owners.  *Id.*  Because RTOs are voluntary organizations, transmission owners that choose to join an RTO retain all pre-existing rights they do not voluntarily relinquish to the RTO. *See Atlantic City Elec. Co. v. FERC*, 295 F.3d 1, 10-11 (D.C. Cir. 2002).

## II.  THE PJM REGIONAL TRANSMISSION EXPANSION PLANNING PROTOCOL

The rules governing the addition of new transmission facilities to the PJM system are generally set forth in three documents:  the Consolidated Transmission Owners Agreement, or Owners Agreement ("CTOA"); the Operating Agreement of the PJM Interconnection, L.L.C., or Operating Agreement ("OA"); and the PJM Open Access

6

Transmission Tariff ("Tariff"). The Tariff also includes a standard interconnection service agreement ("ISA") for new facilities.

Schedule 6 of the Operating Agreement contains the Regional Transmission Expansion Planning ("RTEP") Protocol. PJM uses the RTEP Protocol to "prepare a plan for the enhancement and expansion of the Transmission Facilities in order to meet the demands for firm transmission service, and to support competition, in the PJM Region." RTEP Protocol § 1.1, JA____. PJM is "responsible for the development of the [RTEP] and for conducting the studies . . . on which the plan is based." *Id.* § 1.5.6(a), JA____.

The threshold determination PJM must make is whether there is a need for transmission system enhancements or expansions. *See id.* §§ 1.5.1, JA____. If PJM decides that a need exists, it then evaluates multiple potential system enhancements or expansions to determine what will best meet the identified need. *Id.* §§ 1.5.3-1.5.4, JA____-____. In doing so, PJM may opt to include all, none, or some portion of a proposed project. "For each enhancement or expansion that is included in the recommended plan, the plan shall . . . designate one or more Transmission Owners or other entities to construct, own and, unless

7

otherwise provided, finance the recommended transmission enhancement or expansion." *Id.* § 1.5.6(f), JA____. The plan must be approved by the PJM Board to become final. *Id.* § 1.6, JA____.

## III.  THE PROCEEDINGS BELOW

### A.  The Primary Power Proceeding

#### 1.  The Petition

On November 10, 2009, Primary Power, LLC, filed a Petition for Declaratory Order, seeking FERC's "approval of incentive rate treatments, a stated [Return on Equity], and determinations that Primary Power would be the designated entity to construct, own and finance Grid Plus, with cost-of-service rates, if PJM decides to include Grid Plus in its RTEP." Petition at 4, JA___. Primary Power proposed to interconnect four 500 megavolt-amperes reactive (MVAR) static VAR compensators, or SVCs, at three existing transmission facilities. *Id.* at 15-16, JA___-___. These large compensators would "utilize high-speed switching to inject reactive power" into the transmission system." *Id.* Ex. No. GPL-1 at 7:1-8, JA___. Primary Power described its $200 million "novel" proposal as "the first project to deploy SVCs in such a manner." *Id.* at 66, JA___.

8

Primary Power sought "certainty" that it would "be designated as the entity to construct, own, and finance Grid Plus" if the project were included in the RTEP, rather than going through the regular RTEP process. *Id.* at 75, JA___. It also requested a "fundamental modification" of PJM's standard ISA. Order at P 14, JA____. PJM characterized these requests as "blatantly inconsistent with the existing Commission-approved RTEP process pursuant to Schedule 6 of the PJM Operating Agreement and the transmission interconnection process under Parts IV and VI of the PJM Tariff, as well as Commission precedent." PJM Intervention at 6, JA____.

Primary Power also requested that FERC permit it "to use cost-of-service rate recovery" for Grid Plus. Petition at 80, JA___. This would, in essence, force the users in the Zones where Grid Plus would be built to pay for Primary Power's "novel" proposal. PJM recognized that this request would "amend PJM's approved processes for analyzing merchant transmission projects by requesting cost based rate recovery, recovery which today is not part of the merchant transmission paradigm and as a result is not available under either section 1.5.6(e) of Schedule 6 or the interconnection process." PJM Intervention at 8,

9

JA_____.   "Under section 1.18E of the PJM Tariff, Merchant Transmission Facilities cannot be transmission facilities that are included in the rate base of a public utility and on which a regulated rate of return is earned."  *Id*. at 9, JA____.

### 2.    Protest of the PJM Transmission Owners Group

Multiple parties filed protests and comments to the Petition, including the PJM Transmission Owners Group ("Transmission Owners"), of which Petitioners are each members.  *See* PTO Protest, JA___.  This protest noted, as PJM did, that Primary Power requested changes incompatible with the established RTEP methodology by asking FERC to "pre-determine certain fundamental aspects of the transmission planning process" contrary to the Operating Agreement, PJM Tariff, and FERC precedent.  *Id.* at 5, 7, JA___.  *Id.* at 5, JA___.  The protest also noted—again as PJM did—that Primary Power's request for cost-based rate treatment was inconsistent with its application to interconnect Grid Plus as a merchant transmission facility because the Tariff does not permit cost-based rates for such facilities.  *See* PTO Protest at 14-17, JA___-___ (citing, *inter alia*, Tariff § 1.18E, JA____).

The protest also explained that Primary Power's request to revise the ISA was improper because it failed to seek Tariff revisions pursuant to an FPA section 206 complaint, which is a necessary prerequisite to request a change to a tariff that has been accepted by the Commission. *Id.* at 18-19, 22-23, JA___-___. For example, Primary Power must show, and the Commission must then find, that the "existing ISA language is no longer just and reasonable." *Id.* at 19, JA___. Primary Power made no attempt to do so, and thus its request failed to satisfy FPA section 206. *Id.* at 21-23, JA___-___.

Primary Power's Answer to the Protest argued that Grid Plus was beneficial and merited special treatment, PP Answer I, JA___, but did not explain how its requests were consistent with governing PJM documents or the FPA. Primary Power also stated that it was not seeking to change the Operating Agreement or Tariff, *id.* at 14-18, JA___-___, but this was at odds with the Petition's specific requests for amendments to PJM's Tariff. Primary Power had not properly supported its request for such amendments as required under FPA section 206, and had provided no basis to ask for "preferential rights that are unavailable to others in PJM." PTO Answer at 6, JA___.

11

### 3.    Initial Order

FERC held that the "Tariff permits, but does not require, PJM to designate Primary Power, an entity other than an incumbent transmission owner, as the entity to build Grid Plus if this project is included in the RTEP as a baseline reliability project or economic project.  PJM must designate projects under the relevant tariff provisions in a not unduly discriminatory manner, whether sponsored by transmission owners or others."  Order at P 62, JA___.  It also found that the "Tariff does not prevent Primary Power from seeking cost-based rate recovery if its project is included in the RTEP and satisfies the same reliability and/or economic requirements set forth for other transmission owner cost-based projects in the PJM RTEP and Tariff."  *Id.*

In making these findings, FERC relied on RTEP Protocol sections 1.5.7(c)(iii) and 1.5.6(f).  *Id.* at PP 63-64, JA___.  It stated that because section 1.5.6(f) allowed designation of Transmission Owners "or other entities," the Agreement "permit[s] PJM to designate a non-incumbent developer of transmission facilities to construct, own and finance a project if it is included in the RTEP as a recommended transmission enhancement or expansion."  *Id.* at P 64, JA___.

12

FERC noted that section 1.5.6(f) provided that PJM "shall designate the Transmission Owner that owns transmission facilities located in the Zone where the particular enhancement or expansion is to be located," but stated that this applied only "[t]o the extent that one or more *Transmission Owners* are designated to construct, own and/or finance a recommended transmission enhancement or expansion," and thus did not apply where an "other entity" was designated. *Id.* at P 65 (emphasis added), JA___.

FERC agreed that Primary Power could not be eligible for cost-based rates as a merchant transmission project, but found that Primary Power could receive cost-based rates if Grid Plus were "approved by PJM as a baseline reliability project or as an economic project." *Id.* at P 68, JA___. It ruled that "PJM's Tariff contains no prohibition on a non-incumbent party becoming a transmission owner to receive cost-based rates." *Id.* at P 70, JA___.

FERC "disagree[d] with the PJM Transmission Owners' concern that the Commission's statements in PJM Interconnection, L.L.C., [101 FERC ¶ 61,345 at P 26 (2002),] were intended to preclude third party developers from recovering cost-based rates on their projects." *Id.* at

13

P 72, JA___. It interpreted that order as "dealing only with a requirement that the PJM Tariff make provision for merchant transmission projects," stating that it "did not preclude third parties from seeking cost-based recovery for transmission projects when those projects satisfy the requirements established to ensure that the projects are prudent and used and useful." *Id.*

### 4. Requests for Rehearing

Petitioners timely sought rehearing of the Primary Power Order as required by FPA section 313(a), 16 U.S.C. § 825*l*(a). PTO Rehearing, JA___; PSEG Rehearing, JA___. Petitioners specified several errors in the Primary Power Order, which fall into two main categories.

*First*, FERC improperly ignored the rights of zonal transmission owners. FERC failed to acknowledge "the fundamental and *exclusive* right of all zonal PJM transmission owners to build and own all non-merchant RTEP projects within their respective transmission zones." PSEG Rehearing at 6, JA___. In doing so, FERC "took from the zonal transmission owners a right that pre-existed PJM and which they had never surrendered upon forming or joining PJM." PTO Rehearing at 32-33, JA___-___. As PSEG explained, "[t]his right is a key element of

14

the contractual bargain that PJM transmission owners made in the establishment of PJM as an RTO." PSEG Rehearing at 6-7, JA___-___; *see also id.* at 6-9, JA___-___ (citing sections 4 and 5 of the Owners Agreement and the RTEP Protocol as evidence of the Transmission Owners' intent to retain the right of first refusal "to build transmission in their transmission zones"). While zonal Transmission Owners "voluntarily agreed to transfer to PJM the right to *plan*" all cost-of-service regulated transmission in their zones, "and further, to obligate them to build what PJM had planned, they never surrendered the right to *build* the transmission that PJM planned as part of the RTEP process." PTO Rehearing at 33, JA___.

With respect to FERC's finding that "other entities" could be designated to build, finance, and own RTEP projects, Petitioners explained "[t]hat language was intended to allow for the participation of merchant projects in the regional transmission planning process, not to authorize merchant transmission entities to build reliability transmission projects." PSEG Rehearing at 11, JA___; *see also* PTO Rehearing at 25, JA___ (describing merchant projects as "alternative solutions in which ratepayers do not bear the costs").

15

This understanding was reflected in PJM's compliance filing submitting section 1.5.6(f) to FERC, in which PJM explained that "[e]xcept with respect to merchant transmission facilities, such responsibility generally will be allocated to the PJM Transmission Owner(s) that own facilities in the Zone(s) where the new facilities will be built." PSEG Rehearing at 11 (quoting PJM Interconnection, L.L.C., Compliance Filing at 11, FERC No. RT01-2-006 (Mar. 20, 2003)), JA____. The compliance filing accommodated "entities other than 'traditional' transmission owners" through "changes in Section 1.5.6(e)," the merchant transmission provision, under which "any party may propose to include in the plan a transmission expansion *for which it accepts full cost responsibility.*" *Id.* (same). Thus, the "other entity" language recognizes the role of merchant projects in assuring that alternative solutions for which ratepayers do not bear the costs are given due consideration in the RTEP process, but the language was never intended to supplant the role of the zonal Transmission Owners in constructing centrally-planned expansions in their own Zones.

PSEG explained that FERC's ruling authorizing cost-of-service rates for Grid Plus "gives rise to the erroneous and implausible scenario

16

in which 'other entities' can somehow build regulated cost of service transmission facilities but still not be deemed 'Transmission Owners' within the meaning of Section 1.5.6 (f).  There is no such animal under the PJM Tariff and related agreements."   PSEG Rehearing at 13, JA___.  Merchants—the "other entities" in section 1.5.6—are distinct entities whose roles were never intended to be, and cannot be, conflated with zonal Transmission Owners.

Petitioners further explained that "Transmission Owners are the only entities that bear the obligation to build reliability-based RTEP projects and the only entities that are subject to specific reporting procedures for declining to construct an economic-based RTEP project. Merchant transmission owners and other third parties have no such obligation to build reliability-based RTEP projects."  PTO Rehearing at 26 (footnotes citing agreement provisions omitted), JA____.  "The zonal transmission owner's obligations transcend any particular project because its responsibilities relate to the obligation to provide reliable service and obligation to build within PJM."  *Id*. at 27, JA____.  "The very limited nature and scope of the obligation to build on the part of an owner of discrete [merchant] facilities is altogether different from the

17

zonal transmission owner's zone-wide obligation to build projects needed for reliability and economic efficiency." *Id.* PJM's governing agreements acknowledge this fundamental distinction by recognizing not only the Transmission Owner's obligation, but also its corresponding right, to build within its Zone. *See id.* at 37, JA____.

Petitioners further explained that FERC's ruling exceeds its jurisdiction and conflicts with this Court's decisions in *Atlantic City* and *CAISO*, which hold that utilities may voluntarily give up some rights when joining an RTO without ceding all of them, and FERC may not require utilities to cede their rights. *See* PSEG Rehearing at 19-21, JA___-___; *see also* PTO Rehearing at 32-37, JA___-___.

*Second*, Petitioners argued that FERC's findings misinterpreted PJM's RTEP process. There are no applications, queues, proprietary rights, or preferences for sponsors anywhere in the RTEP Protocol. PTO Rehearing at 19-24, JA___-___. By presuming that Primary Power would be designated to build Grid Plus, FERC's order disregarded, as PJM itself had already noted, the "orderly and comprehensive process designed to maximize the overall system benefits rather than the particular pecuniary interest of a process participant." PSEG

Rehearing at 23, JA___.  Given the objectives of the RTEP process, it is a critical principle that "just because a party proposes a solution to an identified reliability problem does not entitle that party under the existing process to build the project." *Id.* at 23-24, JA___-___.  FERC, however, ignored this principle by requiring PJM to "adequately justify its action if it denied the sponsor of the project the right to construct that project and receive the economic benefit of its project"—thereby imposing a brand new standard for RTEP review.  *Id.* at 23 (quoting Order at P 65), JA___.

A new paradigm in which building designation is "based on 'sponsorship' would wreak havoc on" the RTEP process by "generat[ing] a significant number of ill-conceived and premature project proposals from parties seeking solely to capitalize on being designated to build transmission." *Id.* at 24, JA___.  It would transform "PJM's orderly planning process . . . into an unproductive free-for-all." *Id.*

## B.    The Central Transmission Proceeding

### 1.    Central Transmission's Complaint

On March 25, 2010, Central Transmission, LLC filed an FPA section 206 complaint against PJM, seeking a determination that the

RTEP Protocol and Tariff Schedule 12 "are unjust and unreasonable and unduly discriminatory . . . insofar as these provisions could prevent PJM from designating Central Transmission to construct and own a transmission project . . . under the same cost recovery provisions in Schedule 12 of the PJM Tariff that are available to those entities that currently own transmission facilities that comprise the PJM transmission system."  Complaint at 1, JA___.

The Complaint acknowledged that transmission expansion projects in PJM are either "regulated, rate-based transmission" or "merchant transmission."  *Id.* at 2, JA___.  Only transmission owners within the PJM system are eligible for the former.  *Id.* at 3, JA___. Based on concerns with "undue discrimination," however, Central Transmission sought (1) modification of PJM agreements to allow non-transmission owners to recover cost-based rates, and (2) clarification that entities other than transmission owners can be designated to own or construct transmission expansion projects.

## 2.    Protest of the PJM Transmission Owners

Petitioners protested that Central Transmission's complaint failed to meet the section 206 burden of proof.  PTO CT Protest, JA___.

*First,* Central Transmission failed to show that the Operating Agreement provisions at issue were "unjust and unreasonable, or unduly discriminatory. These provisions serve important purposes, and are part of an overall construct in the Tariff and [Operating Agreement] that balances PJM's and the transmission owners' obligations with respect to necessary transmission construction," and recognizes the important differences between zonal and merchant Transmission Owners, "while facilitating new transmission entry. It was a fundamental 'benefit of the bargain' for transmission owners that, along with their <u>obligation</u> to build came a corresponding <u>right</u> to build . . . within their respective service territories." *Id.* at 16, JA___. Nor did Central Transmission demonstrate that its proposed changes to the RTEP Protocol were just and reasonable.

Petitioners also explained that Central Transmission's undue discrimination concerns were not applicable to the zonal transmission owners' rights that must be considered in context with corresponding obligations within PJM's RTEP process. *Id.* at 16-27, JA___-___. A zonal owner's right of first refusal "does not mean, as Central Transmission allege[d], that the Tariff creates barriers to entry." *Id.* at

21

27, JA___.  As nothing in the Tariff or Operating Agreement prevented Central Transmission from building the project as a merchant project or designated market solution, Central Transmission failed its burden of proof.  *Id.* at 27-32, JA___-___.  What Central Transmission was asking for, moreover, "would disrupt the PJM regional planning and interconnection process and disadvantage other market participants and the transmission owners."  *Id.* at 32, JA___.

### 3.    Complaint Order

Relying on its findings in *Primary Power*, FERC found that Central Transmission was "eligible to be designated by PJM to build the facilities in question under the [Tariff] and Operating Agreement," that this was consistent with existing rule for the RTEP process, and that no revisions to the Tariff or Operating Agreement were needed.  Complaint Order at P 2, JA___.  In short, FERC applied its *Primary Power* analysis to the Complaint; determined that Central Transmission could be designated to build the facilities at issue *and* seek cost-of-service rate treatment; and dismissed the Complaint.  *Id.* at P 46, JA___.  To reach this conclusion, FERC characterized its *Primary Power* decision as determining that "the OATT and Operating Agreement as written

22

permit PJM to designate non-incumbent transmission developers to build RTEP projects and that non-incumbent developers are eligible to seek cost-of-service rate treatment under Section 12 similar to other transmission owners providing service under Schedule 12." *Id.*

### 4.  Request for Rehearing

PSEG timely sought rehearing.  *See* PSEG CT Rehearing, JA___. It attached and incorporated its arguments from the *Primary Power* rehearing request, and focused on the failure of both orders to recognize the "contractual and FERC-approved exclusive right of the PJM Transmission Owners to build non-merchant transmission upgrades within their service territories or zones."  *Id.* at 2, JA___.  PSEG explicitly called out the failure of FERC to address the Transmission Owners' arguments regarding the Right of First Refusal as arbitrary and capricious.  *Id.* at 8-9, JA___-___.

## IV.  FERC'S ORDERS ON REHEARING

On July 19, FERC denied the requests for rehearing in both the *Primary Power* and *Central Transmission* cases.  The bulk of FERC's analysis on rehearing is set forth in the Rehearing Order in the *Primary Power* case, which the *Central Transmission* decision briefly reiterated

23

and incorporated by reference.[3]   *See* Complaint Rehearing Order at PP 16-22, JA____-____.   FERC reaffirmed its earlier holding "that the language in the RTEP procedures, while ambiguous, does not establish a right of first refusal on behalf of incumbent Transmission Owners and does not preclude a non-incumbent selected in the RTEP process from seeking and receiving cost of service rate recovery under the Federal Power Act."   Rehearing Order at P 35, JA___; *accord* Complaint Rehearing Order at PP 17-19, JA___-___.

FERC interpreted its initial orders "requiring PJM to establish a process for reviewing economic projects," to mean "that the RTEP procedures for economic projects were designed to provide an opportunity for a wide variety of participants and different business models to propose projects that would be economically beneficial by reducing energy costs by more than the cost of the project. Transmission Owners were permitted to participate in this process, but were neither guaranteed the right to construct the project nor were obligated to undertake such construction."   Rehearing Order at P 35, JA___.

---

[3]     As the *Central Transmission* Orders add no new analysis, this brief focuses nearly exclusively on the *Primary Power* proceeding.

## SUMMARY OF THE ARGUMENT

It is well-settled that FERC has no authority over the siting and construction of electric transmission facilities. That authority belongs to the several states. FERC conceded, as it must, that its jurisdiction under the FPA is limited to regulating transmission rates after a facility is built. The Transmission Owners who formed or joined PJM did not cede their transmission construction rights to PJM. Therefore, FERC may not lawfully eliminate a utility's right of first refusal to construct transmission facilities within its state-franchised service territory by purporting to interpret PJM's governing agreements for rate purposes.

In any event, FERC's interpretation of the Owners Agreement and Operating Agreement is unsustainable and self-contradictory. The text of those agreements does not support FERC's determination that a transmission developer may both (i) build transmission facilities in the Zone of an existing Transmission Owner without consent and (ii) recover the expense of its invasion through cost-based rates. FERC's analysis strains to find ambiguity where none exists and the ultimate result is an irrational interpretation of PJM's governing agreements

25

that provides third party non-signatories with superior rights to existing Transmission Owners.

FERC's orders contravene the Owners Agreement in several ways. At the most basic level, FERC's determination that transmission developers have the right to build facilities in the Zone of an incumbent Transmission Owner violates the *Atlantic City* doctrine and the plain text of the Owners Agreement, which reserves all Transmission Owner rights that are not specifically given to PJM. Next, FERC's recognition of transmission developers as a hybrid class with many rights and no particular responsibilities finds no support in the Owners Agreement, which only recognizes two types of Transmission Owners—utilities or merchants that actually own Transmission Facilities. Furthermore, contrary to FERC's representations, its holding below destroys or vitiates specific Transmission Owner filing rights and territorial rights the Owners Agreement expressly protects.

FERC's interpretation of the Operating Agreement is also egregiously flawed. In particular, section 1.5.6(f) of Operating Agreement plainly forbids a Transmission Owner from constructing facilities in another Transmission Owner's Zone without that owner's

26

consent.  In order to avoid that mandate, FERC held that it does not apply to transmission developers who are not yet Transmission Owners, notwithstanding the fact that, upon completion of any transmission facility, such a developer would become a Transmission Owner subject to section 1.5.6(f).

FERC compounded that error by reversing its theory on the question of cost-based rates.  Numerous provisions in the Operating Agreement (as well as the Owners Agreement and Tariff) deny merchant eligibility for cost-based rates.  Therefore, FERC had to classify transmission developers as something else to circumvent that bar.  FERC's answer was to hold that developers are eligible for cost-based rates because they will become Transmission Owners once they complete construction of a designated facility.  This is not reasoned decisionmaking.  FERC cannot call developers non-Transmission Owners to avoid the bar on construction, then make developers eligible for cost-based rates by labeling them nascent Transmission Owners.

FERC also arbitrarily and capriciously ignored several key arguments and judicial precedent raised on rehearing.  These errors

27

alone require remand even apart from the jurisdictional and interpretive errors outlined above.

## STANDING

FERC's orders purport to eliminate our right of first refusal as Transmission Owners to construct economic transmission enhancements within our respective Zones. That determination destroys a bargained-for contractual right under the PJM Owners Agreement and Operating Agreement and it impairs the value of our respective public utility franchises. It is long settled that the impairment of a public utility franchise is a cognizable injury. *See, e.g.*, *Frost v. Corp. Comm'n of Okla.*, 278 U.S. 515, 520 (1929); *Morris Cnty. Transfer Station, Inc. v. Frank's Sanitation Serv., Inc.*, 617 A.2d 291, 293-94 (N.J. App. Div. 1992).

## ARGUMENT

## I.    STANDARD OF REVIEW

Section 10(e) of the APA directs the Court to "hold unlawful and set aside agency action, findings, and conclusions found to be—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; [or] (C) in excess of statutory jurisdiction . . . ." 5 U.S.C. § 706(2). "To survive this review, FERC 'must "examine the

28

relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."'" *PSEG Energy Res. & Trade LLC v. FERC*, 665 F.3d 203, 208 (D.C. Cir. 2011) (quoting *PPL Wallingford Energy LLC v. FERC*, 419 F.3d 1194, 1198 (D.C. Cir. 2005) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983))). "Among other things, an agency's failure to respond meaningfully to objections raised by a party renders its decision arbitrary and capricious." *Id.* (alterations and citations omitted).

This petition challenges FERC's assertion of jurisdiction over the construction of transmission facilities and also FERC's interpretation of PJM's governing agreements. "In reviewing the Commission's assertion of jurisdiction under the FPA and its interpretation of a Commission-approved contract, the court applies the familiar two-step analysis under *Chevron, U.S.A., Inc. v. NRDC,* 467 U.S. 837, 842-44 (1984)." *Transmission Agency of N. Cal. v. FERC*, 628 F.3d 538, 543-44 (D.C. Cir. 2010) (citations omitted).

With regard to FERC's jurisdiction, the first step is to determine "whether Congress has directly spoken to the precise question at issue."

*Transmission Agency of N. Cal. v. FERC,* 495 F.3d 663, 673 (D.C. Cir. 2007) (quoting *Chevron*, 467 U.S. at 842). "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* (quoting *Chevron*, 467 U.S. at 842-43). "[I]f the statute is silent or ambiguous with respect to the specific issue," the Court proceeds to the second step and asks "whether the agency's answer is based on a permissible construction of the statute." *Id.* (quoting *Chevron,* 467 U.S. at 843). The Court will "uphold the agency's interpretation as long as it is reasonable." *Id.* (citing *Village of Bergen v. FERC,* 33 F.3d 1385, 1389 (D.C. Cir. 1994)).

When applying this analysis, an "agency's interpretation of [a] statute is not entitled to deference absent a *delegation of authority* from Congress to regulate in the areas at issue." *Id.* (emphasis in original) (quoting *American Library Ass'n v. FCC,* 406 F.3d 689, 699 (D.C. Cir. 2005) (quoting *Motion Picture Ass'n of Am., Inc. v. FCC,* 309 F.3d 796, 801 (D.C. Cir. 2002))); *accord, e.g.*, *United States v. Mead Corp.,* 533 U.S. 218, 226 (2001). There is no "express delegation of authority,"

unless "Congress has 'explicitly left a gap for an agency to fill.'" *Mead*, 533 U.S. at 227 (quoting *Chevron,* 467 U.S. at 843).

The Court applies a "variation" of the *Chevron* analysis when "reviewing FERC's interpretation of a FERC-approved contract." *Southern Cal. Edison Co. v. FERC,* 502 F.3d 176, 181 (D.C. Cir. 2007). "Applying *Chevron* in this context," the Court will "first consider *de novo* whether the [agreement] unambiguously addresses the matter at issue. If so, the language of the agreement controls for [the Court] 'must give effect to the unambiguously expressed intent of' the parties.'" *Id.* (quoting *Ameren Servs. Co. v. FERC*, 330 F.3d 494, 498 (D.C. Cir. 2003) (quoting *Chevron,* 467 U.S. at 843). To the extent the Court reaches "*Chevron*'s second step, the court will evaluate the reasonableness of the agency's interpretation using the normal tools of . . . interpretation." *Chemical Waste Mgmt., Inc. v. EPA*, 873 F.2d 1477, 1482 (D.C. Cir. 1989).

## II.  THE FPA DOES NOT PERMIT FERC TO MANDATE THE CONSTRUCTION OF TRANSMISSION LINES, MUCH LESS WHO WILL BUILD THEM, AND FERC MAY NOT DIRECT PJM TO EXERCISE AUTHORITY THAT FERC ITSELF LACKS

"As a federal agency, FERC is a 'creature of statute,' having 'no constitutional or common law existence or authority, but *only* those authorities conferred upon it by Congress.'" *Atlantic City*, 295 F.3d at 8 (quoting, with emphasis, *Michigan v. EPA*, 268 F.3d 1075, 1081 (D.C. Cir. 2001)). "Thus, if there is no statute conferring authority, FERC has none" because "'an agency literally has no power to act . . . unless and until Congress confers power upon it.'"  *Id.* (quoting *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986)); *accord, e.g.*, *CAISO*, 372 F.3d at 398.

The orders on review are unlawful because nothing in the FPA authorizes FERC to determine who will build a transmission project within a zonal Transmission Owner's Zone in PJM, much less to take away a Transmission Owner's exclusive right to build economic transmission expansion or enhancement projects within its respective state-established utility service territory.  And, because FERC lacks this authority, it may not require or permit PJM to designate a third

32

party to build such a project within an incumbent Transmission Owner's defined Zone, much less invade or modify an incumbent transmission owner's property to do so.

"The states have traditionally assumed *all* jurisdiction to approve or deny permits for the siting and construction of electric transmission facilities." *Piedmont*, 558 F.3d at 310 (emphasis added). This principle is so well established that when Congress decided in 2005 to transfer additional jurisdiction to FERC to assure that timely decisions were made on transmission siting in areas of particular national interest, *see* FPA section 216, 16 U.S.C. § 824p, it did so only in a "measured" way, intending no "sweeping transfer of jurisdiction," and it did not allow FERC to require construction over a state's objection. *Id.* at 310-14.

Here, however, FERC has asserted broad jurisdiction to direct the assignment of transmission to non-incumbent third parties, contrary to the understanding of the Parties to PJM's Owners Agreement, without a shred of evidence that Congress intended such a course of action. The ruling in *Piedmont* that FERC exceeded its authority by intruding into transmission siting matters thus requires reversal of FERC's unauthorized actions here.

FERC's response to these arguments has been an evasive *non sequitur*. FERC qualified its assertion of jurisdiction—as it must—to be the regulation of *rates* for transmission services *after transmission facilities are built*.[4] That response places the cart before the horse. FERC's authority to regulate the rates that public utilities may charge does not include the authority to mandate where, how, or by whom transmission facilities will be built in the first instance. Under the FPA, those questions are reserved to states.

Courts routinely reject FERC's assertion of authority to regulate areas outside its jurisdiction by leveraging its authority to regulate rates. Rejecting such an assertion in *CAISO*, this Court held provisions in an RTO operating agreement that establish governance mechanisms

---

[4]     *See* Rehearing Order at P 43 ("Under section 201 of the Federal Power Act, Primary Power's facilities *when constructed and in-service* would meet the definition of transmission facilities, and the Commission has the jurisdiction to establish the rates for such facilities.") (emphasis added), JA____; *id.* at P 47 & n.74 ("A non-incumbent transmission developer building transmission facilities will become a PJM Transmission Owner *when its facilities go into service*. All entities constructing transmission facilities under section 1.5.6 or section 1.5.7 *will become* transmission owners subject to our jurisdiction *when their facilities are in-service*.") (emphasis added), JA____; *id.* at P 69 ("Primary Power's facilities *when constructed* would meet the definition of transmission facilities, and the rates for such facilities must be just and reasonable as determined by the Commission." (emphasis added) (footnotes omitted), JA____.

were beyond FERC's jurisdiction, and FERC's jurisdiction is limited to matters that "directly affect the rate or are related to the rate, not all those remote things beyond the rate structure that might in some sense indirectly or ultimately do so." 372 F.3d at 398-99, 403. That holding also applies here, where FERC seeks to use its rate-making authority to justify its assertion of jurisdiction to determine who will construct a facility and whether the PJM agreements provide for a right of first refusal by the incumbent operator.

*CAISO* also makes plain that the rights reserved by public utilities that form an RTO are not limited to those expressly conferred by the FPA. The corporate governance matters the court protected by rejecting FERC's attempt to remove CAISO's board of directors and dictate the method of choosing a new one are not expressly recognized or preserved by the FPA, but were protected by this Court as a matter of state law. *See* 372 F.3d at 403-04. Although Petitioners pointedly relied on *CAISO*, *see* PTO Rehearing at 35-36, JA___-____, FERC entirely ignored that decision in its rulings.

Similarly, this Court held in *Atlantic City* that that while utilities may voluntarily give up by contract some of their rate-filing freedom

35

under FPA section 205, FERC may not require them to do so. *See* 295 F.3d at 9-11. In particular, FERC may not rely not rely on its own orders or regulations to create statutory authority where none exists. *See id.* at 211. Recognizing that RTO membership is voluntary under FPA section 202, 16 U.S.C. § 824a, this Court found it "anomalous" that FERC would attempt to control RTO membership under FPA section 203, 16 U.S.C. § 824b. *Id.* at 12. Noting that FERC had never before attempted to use FPA section 203 "where only operational control was transferred," *id.*, and that "'[a]gency authority may not be lightly presumed,'" this Court found "that FERC's attempted reach under section 203 exceed[ed] its statutorily defined grasp." *Id.* at 13 (citation omitted).

FERC's response was confined to a narrow reading of *Atlantic City*. *See* Rehearing Order at PP 67-70, JA____-___. Ignoring the question whether it had jurisdiction to act at all, FERC held that it did not transgress *Atlantic City* "because the Commission is not taking away any section 205 filing right from the transmission owners," but rather giving new cost-of-service filing rights to would-be transmission developers. *Id.* at P 69, JA___. But *Atlantic City* is not limited to

36

section 205 filing rights. Rather, it provides that "the Commission cannot require that the PJM Transmission Owners cede additional rights to PJM that they did not cede as part of their contractual compact with PJM." PSEG Rehearing at 21, JA____; *accord, e.g.*, PTO Rehearing at 34 (citing *Atlantic City* for the proposition that FERC may not "attempt[] to take away rights that had been retained by the zonal transmission owners"), JA____. The premise of *Atlantic City* is that RTO membership is voluntary under FPA section 202 and therefore FERC may not force public utilities to give up any pre-existing rights they do not voluntarily choose to surrender in forming or joining an RTO. *See* 295 F.3d at 12 (citing cases). In any event, FERC did in fact abrogate the Transmission Owners' exclusive section 205 filing rights. *See infra* Part III.A.4.

Finally, the Eighth Circuit's decision in *Northern States Power Co. v. FERC*, 176 F.3d 1090 (8th Cir. 1999)—which FERC also arbitrarily ignored—aptly stands for the principle that FERC may not "do indirectly what it is prohibited from doing directly [and] intercede in a matter reserved by Congress to the states." 176 F.3d at 1095 (paraphrasing *Altamont Gas Transmission Co. v. FERC*, 92 F.3d 1239,

37

1248 (D.C. Cir. 1996)).  In *Northern States*, FERC required a public utility to curtail transmission to its retail consumers on a comparable basis with interstate wholesale customers during power constraints. *See id.*  There, as here, FERC asserted jurisdiction to eliminate undue discrimination and "encourage competition in the wholesale bulk power market place."  *Id.* at 1091; *cf. e.g.*, Rehearing Order at P 70 (competition), JA____; *id.* at PP 80, 89-90 (discrimination), JA____, ____. The court rejected that rationale and ruled that FERC exceeded its jurisdiction by attempting to regulate retail practices reserved exclusively to states.  176 F.3d at 1096.  Here, FERC's intrusion into state authority to site transmission and regulate utility franchises is not meaningfully different.  If the alleged discrimination or impediment to competition FERC seeks to cure arises from a practice that FERC has no statutory authority to control in the first instance, then FERC has no authority to act.  *See id.* at 1094-97; *Altamont*, 92 F.3d at 1247-48.

FERC's authority under the FPA is very different from its authority under the Natural Gas Act, which gives it broad authority to grant construction certificates and prohibits certificate holders from abandoning service without Commission approval.  *See* 15 U.S.C.

§ 717f(a). By contrast the FPA gives FERC only limited authority to require service[5] and does not allow FERC to preempt state authority to authorize the siting of transmission facilities. The need for state approval is recognized in PJM's governing agreements, which make the "Obligation to Build" conditional upon "obtain[ing] any necessary state or local siting, construction and operating permits" and "the ability to acquire necessary right-of-way." RTEP Protocol § 1.7(a), JA____; *accord* Owners Agreement § 4.2.1 (same), JA____.

In addition to exceeding FERC's jurisdiction, the orders on review also constitute a failure of reasoned decisionmaking. The objection squarely presented below was that FERC has no jurisdiction under the FPA to direct what entities will build transmission facilities in the incumbent PJM Transmission Owners' Zones, and therefore no jurisdiction to delegate that function to PJM either. It is no answer to that argument for FERC to say, as it repeatedly did below, that FERC has jurisdiction under FPA sections 205 and 206, 16 U.S.C. §§ 824d &

---

[5]    *See* FPA section 210, 16 U.S.C. § 824i (allowing FERC, upon complaint, to order interconnection with unaffiliated generators and utilities); FPA section 211, *id.* § 824j (allowing FERC, upon complaint, to order "wheeling"—*i.e.*, transmission—for the benefit of interconnected generators and utilities).

39

824e, to regulate rates after the facilities are built.  FERC's evasion of the real issue and its "'failure to respond meaningfully'" to our legitimate objections "'renders its decision arbitrary and capricious.'" *PSEG Energy*, 665 F.3d at 208 (quoting *PPL Wallingford Energy*, 419 F.3d at 1198 (quoting *Canadian Ass'n of Petroleum Producers v. FERC*, 254 F.3d 289, 299 (D.C. Cir. 2001))); *see also id.* at 209 (same).  "No matter how rudimentary a claim, an agency is not entitled under the APA to respond with a non sequitur."  *City of Vernon v. FERC*, 845 F.2d 1042, 1048 (D.C. Cir. 1988).

## III.  FERC'S INTERPRETATION OF PJM'S GOVERNING AGREEMENTS IS ARBITRARY AND CAPRICIOUS

Just as FERC is a creature of statute, PJM is a creature of contract—specifically, the contract by and among PJM's Transmission Owners setting forth the conditions under which PJM may exercise operational control over the transmission facilities they build and own. The formation of RTOs is a voluntary exercise under FPA section 202. *See* 16 U.S.C. § 824a; *Atlantic City*, 295 F.3d at 12 (citing cases); *Pub. Util. Dist. No. 1*, 272 F.3d at 210-11.  Therefore, FERC may not delegate any more authority to PJM than the Transmission Owners voluntarily contract to surrender.  *See Atlantic City*, 295 F.3d at 9-13.  This

understanding is incorporated into Article 5 of the Owners Agreement, which provides that "[r]ights not specifically transferred by the Parties to PJM pursuant to this Agreement or any other agreement are expressly reserved by the Parties." CTOA § 5.6, JA____.

The Transmission Owners' exclusive right to build transmission projects to serve customers within their respective service territories pre-dates the formation of PJM and the Transmission Owners never surrendered that right upon forming or joining PJM. *See* PTO Rehearing at 32-33, JA____-____. "While they voluntarily agreed to transfer to PJM the right to *plan* such transmission and further, to obligate them to build what PJM planned, they never surrendered the right to *build* the transmission that PJM planned as part of the RTEP process." *Id.* at 33; *accord* PSEG Rehearing at 8 ("[N]ot only did the PJM Transmission Owners assert a right to build transmission in their transmission zones, and commit[] to build all required RTEP projects, they specifically reserved that right to themselves exclusively and did not transfer that right to PJM or authorize PJM to designate others to build in their service territories."), JA____. FERC's contrary

41

interpretation of the Owners Agreement and Operating Agreement is irrational and unsustainable.

The Parties to the Owners Agreement—the Transmission Owners and PJM—intended and understood that agreement to provide incumbent Transmission Owners with a right of first refusal to build new economic projects within their respective Zones. That understanding—reflected in the Operating Agreement's RTEP Protocol and Schedule 12 of PJM Tariff—is why Primary Power sought a declaratory order urging FERC to adopt a different interpretation of those provisions and Central Transmission filed a complaint under FPA section 206 to *change* them.

In response, FERC announced that it could "not find that a tacit agreement or a contractual bargain providing a right of first refusal for economic projects for transmission owners is embodied in these agreements." Rehearing Order at P 59, JA____. It is fair to observe, however, that FERC was not motivated to look very hard, since FERC had other reasons to construe any colorable ambiguity, whether real or manufactured, against a right of first refusal. Had FERC found such a right, it would have been forced to confront the fact that Primary Power

did not present a proper ground for modifying PJM's agreements and Tariff under FPA section 206; nor did FERC make the requisite findings to do so.

FERC is prohibited from making findings that are inconsistent with provisions in existing FERC-filed rate schedules without first making a determination that such provisions are unjust and unreasonable or unduly discriminatory and preferential and the newly proposed provisions are just and reasonable and not unduly discriminatory or preferential. *See, e.g.*, *Exxon Mobil Corp. v. FERC*, 571 F.3d 1208, 1211 (D.C. Cir. 2009); *Panhandle E. Pipe Line Co. v. FERC*, 613 F.2d 1120, 1129 n.47 (D.C. Cir. 1979) (same).

## A. FERC's Expansive Interpretation of the Owners Agreement Conflicts with the Plain Meaning of Its Provisions

The orders on review pay little attention to the Owners Agreement. We begin with that agreement because it is what allows PJM to exist in the first place and is the basis for the RTEP Protocol in Schedule 6 of the Operating Agreement.

Two background rules govern interpretation of the Owners Agreement. Unfortunately, FERC ignored both of them. First, as

43

discussed above, the Owners Agreement does not confer any Transmission Owner rights that are "not specifically transferred" to PJM. CTOA § 5.6, JA____. Second, the Owners Agreement only recognizes Transmission Owners that actually own PJM Transmission Facilities, not potential transmission developers. *See id.* § 1.28, JA____-____. Actual Transmission Owners come in two varieties: (i) utilities who already owned Transmission Facilities when they formed or joined PJM and (ii) merchants who construct "market solutions" at market-based rates. There are thirty-seven PJM Transmission Owners, nearly all of which are, or are directly affiliated with, traditional utilities that have a legal obligation to serve Native Load Customers within a specific Zone. *See id.* attach. A, JA____-____. Each of the incumbent Transmission Owner utilities has a unique revenue requirement and cost-of-service transmission rate under Attachments H-1 through H-22B (Annual Transmission Rates) and Schedules 7 and 8 (Firm and Non-Firm Point-to-Point Transmission Service) of the PJM Tariff. The two merchant Transmission Owners—Neptune Regional Transmission System, LLC ("Neptune") and Linden VFT, LLC ("Linden")—provide bulk power transmission services from the coastline of New Jersey on

44

the edge of PJM to New York City in the New York Independent System Operator, Inc. *See* PJM Tariff, attach. T, JA____. In the Owners Agreement, a merchant Transmission Owner is a "Zero Revenue Requirement Party," which owns Transmission Facilities "for which it does not have a cost-of-service rate for such services set forth in Schedules 7 and 8 and Attachment H of the PJM Tariff." CTOA § 1.32, JA____. The rates, terms and conditions for Neptune and Linden are published in Schedules 14 and 16 of the PJM Tariff, respectively. *See* JA____-____; ____-____.

## 1.    Section 4.2—Obligation to Build

Section 4.2 of the Owners Agreement defines the Parties' Obligation to Build. Section 4.1.4 delegates to PJM "responsibility" to prepare an RTEP and obligates the Parties "to provide information reasonably requested by PJM to prepare" it. JA____. Section 4.2.1 provides that Transmission Owners "shall construct and own" transmission projects designated by PJM unless they are unable or unwilling to do so for any of five legal or economic reasons:

> Subject to: (i) the requirements of applicable law, government regulations and approvals, including, without limitation, requirements to obtain any necessary state or local siting, construction and operating permits; (ii) the

45

availability of required financing; (iii) the ability to acquire necessary right-of-way; (iv) the right to recover ... all reasonably incurred costs, plus a reasonable return on investment; and (v) other conditions or exceptions set forth in the [RTEP] Protocol, *Parties designated as the appropriate entities to construct and own or finance enhancements or expansions applicable to the PJM Region specified in the [RTEP] or required to expand or modify Transmission Facilities pursuant to the PJM Tariff shall construct and own or finance such facilities or enter into appropriate contracts to fulfill such obligations.*

CTOA § 4.2.1 (emphasis added), JA____.  The next section requires Parties that are designated to build new projects to acknowledge that designation or explain their basis for refusing.  *See id.* § 4.2.2, JA____.  The final section defines the rights of Zero Revenue Requirement Parties.  *See id.* § 4.2.3, JA____.  FERC's orders only address section 4.2.1.  *See* Rehearing Order at P 60, JA____.

FERC erroneously found that the phrase "'parties [sic] designated as appropriate entities to construct'" in section 4.2.1 does not provide a right of first refusal for economic projects because it "does not necessarily limit such parties [sic], and certainly not in a manner that would be inconsistent with section 1.5.7 of the Operating Agreement, as discussed [earlier in its order]."  *Id.*  FERC's misquotation of the term "parties" as a non-capitalized term is telling because the properly

46

capitalized term "Parties" has a specific meaning that, contrary to FERC's reading, *does* "necessarily limit such [P]arties" to include only Transmission Owners who actually own Transmission Facilities. *See* CTOA preamble, JA____; *id.* §§ 1.27, 1.28, JA____-____.   Moreover, FERC's reliance on section 1.5.7 of the Operating Agreement is bootstrapping, because FERC's reinterpretation of that provision is itself in dispute (and wrong for reasons we discuss *infra* in Part III.B.3).

FERC also erroneously found that the phrase "required to expand or modify Transmission Facilities" does not support a right of first refusal for economic projects because "PJM Transmission Owners are not required to construct economic facilities, so such a requirement does not apply to economic construction pursuant to section 1.5.7 o[f] the Operating Agreement."   Rehearing Order at P 60, JA____.   It is nonsensical for FERC to claim that section 4.2.1 does not recognize a right of first refusal to build economic facilities on the ground that, unlike reliability projects, Transmission Owners are not required to build them; a right to *refuse* can only exist where PJM's designation is *not* mandatory.   In any event, the text of section 4.2.1 does not distinguish between reliability and economic projects.   PJM uses the

47

same verb—designate—for both of them.  *See* RTEP Protocol § 1.5.6(f), JA____.

There is a deeper structural problem with FERC's analysis. FERC notes that section 4.2.1 describes two types of Transmission Owners: (i) "Parties designated as the appropriate entities to construct and own or finance enhancements or expansions applicable to the PJM Region," and (ii) Parties "required to expand or modify Transmission Facilities pursuant to the PJM Tariff."  But FERC failed to recognize that those two distinct formulations are used to contrast the two recognized types of Transmission Owners—utilities and merchants—in next two subsections.

Section 4.2.2 uses the first formulation with respect to utilities with traditional cost-of-service rates when PJM "designat[es] a Party to construct and own or finance specified enhancements or expansions applicable to the PJM Region" and it requires Parties to state their "acknowledgement of such designation or the reasons why the Party disagrees with such designation or any aspect thereof."  *Id.* § 4.2.2, JA____.  This section documents a utility's right to refuse to "construct and own or finance" designated projects in "the PJM Region" for the

reasons stated in section 4.2.1. The next section uses the second formulation to contrast the obligation of a Zero Revenue Requirement Party to "construct and own or finance all expansions and modifications of *its own* Transmission Facilities or enter into appropriate contracts to fulfill such obligation." *Id.* § 4.2.3 (emphasis added), JA____. "A Zero Revenue Requirement Party" has no obligations under section 4.2.1 "except to the extent that such enhancements or expansions involve the expansion or modification of *that Party's* Transmission Facilities" and "*no other Party* shall be required to participate in the construction and ownership or financing of such expansion or modification." *Id.* (emphasis added).

The point is that the Owners Agreement recognizes two, and only two, types of Transmission Owners: (i) incumbent utilities with cost-based rates, who serve Native Load Customers within their Zones and have a general obligation to build within their zones subject to specified exceptions; and (ii) Zero Revenue Requirement Owners, who may not recover costs through cost-based rates, and are only obligated to expand or modify their own existing facilities. Only utility Transmission Owners have the right build—or refuse to build—cost-of-service

49

economic projects in their respective Zones; merchants have a different set of rights and obligations.  FERC reads this critical distinction out of the Owners Agreement.

FERC's notion that the Owners Agreement allows transmission developers to set themselves up as Transmission Owners with cost-based rates is false because there is "no such animal" under the Owners Agreement or any other part of the PJM Tariff.  PTO Rehearing at 13, JA____.  FERC may not invent such a creature on the ground that, in FERC's view, the Owners Agreement does not expressly forbid it.  That presumption is backwards.  Under section 5.6, the question is whether the Owners Agreement expressly allows it, and it does not.  Petitioners emphasized section 5.6 as the key rule governing interpretation of the Owners Agreement, *see, e.g.*, PTO Rehearing at 33, JA____; PSEG Rehearing at 8, JA____.  FERC acknowledged our argument in its description of the pleadings, *see* Rehearing Order at P 30 & n.50, JA____, but FERC never otherwise engaged or even mentioned it.

## 2.    Section 5.2—Facility Rights

Section 5.2 of the Owners Agreement provides that "[e]ach Party shall have the right to build, finance, own, . . . or otherwise transfer or

50

convey all or any part of its assets, including any Transmission Facilities," including the right "to terminate the relationship with PJM" or to create "another entity (including a joint venture or an [Independent Transmission Company])" with "the right to own and/or operate its Transmission Facilities." JA____. FERC found that this "provision does not guarantee a transmission owner the right to construct all assets in a defined zone or geographic area." Rehearing Order at P 61, JA____. Standing alone, that is true; but not when taken in conjunction with other provisions of the Owners Agreement that PSEG also listed. PSEG's point in citing section 5.2 was to underscore that only Transmission Owners, in their two recognized forms, have the right or obligation to build Transmission Facilities. *See* PSEG Rehearing at 8, JA____.

FERC's other remarks in connection with section 5.2 are misguided. For example, it is not true that section merely "preserves a transmission owner's authority over its existing facilities." Rehearing Order at P 61, JA____. Transmission Owners do not build *existing* facilities. Similarly, it is only true in a disingenuously technical sense that "Primary Power does not propose to take away any transmission

owner's ability to use its property or right-of-way, nor build on or acquire any transmission owner asset." *Id.* Primary Power proposed to attach major new facilities directly to existing facilities from adjacent land and those new facilities are expressly designed to substantially alter the transmission dynamics of existing facilities. *See* Order at PP 5, 11 (describing the facilities), JA____; *see, e.g.*, Petition, Exs. GPL-11 to GPL-14, JA____-____ (same). That is why Primary Power proposed a "fundamental modification" to PJM's Interconnection Service Agreement "to permit Primary Power to develop the project." Order at P 14, JA____.

### 3.    Section 5.4—Federal Power Act Rights

The Transmission Owners' reservation of all rights "not specifically transferred" to PJM in section 5.6 of the Owners Agreement is reinforced by section 5.4, which states that, "[e]xcept as otherwise provided in this Agreement, each Party retains its rights pursuant to the Federal Power Act and the FERC's rules and regulations thereunder." As set out above in Part II, *supra*, FERC's orders deprived Transmission Owners of their statutory rights under the FPA, as well as state-granted rights, and thus were beyond FERC's lawful authority.

### 4. Section 7—Section 205 Rights and Zone Modifications

FERC wrongly claims that it is "not taking away any section 205 filing right from the transmission owners." Rehearing Order at P 69, JA____. Section 7.4 of the Owners Agreement defines the zonal boundaries of incumbent Transmission Owners, JA____, and section 7.1 "expressly and individually reserves" specific filing rights with respect to those Zones, plainly treating them as a protected interest. JA____. Article 7.1.1 provides that:

> Each Party shall have the exclusive right to file unilaterally at any time pursuant to Section 205 of the Federal Power Act to establish or change the transmission revenue requirement for services provided under the PJM Tariff with respect to its Transmission Facilities (regardless of whether such revenue requirement is used to support rates and charges for delivery *within its Zone* or outside *its Zone*). This right includes, but is not limited to, the right to file a transmission revenue requirement, or a revenue requirement that is based on incentive or performance-based factors.

JA____ (emphasis added). Section 7.1.3 similarly provides an exclusive and unilateral right "to change rates and charges for transmission and ancillary services . . . for delivery *within its Zone*, which rates and charges are based solely on the costs of the Transmission Facilities of such Party." JA____ (emphasis added). These exclusive rights include

53

modifications to numerous provisions in the PJM Tariff—in particular, Schedule 12, which establishes the Transmission Enhancement Charge for the Required Transmission Projects at issue in this case.  *See* CTOA § 7.3.4, JA___; *id.* § 7.3.5 (listing provisions regarding particular Zones); PJM Tariff Schedule 12, JA____-____; *id.* Schedule 12 Appendix (stating allocations for Required Transmission Projects on a zonal basis), JA____-____.  Section 7.4 further crystallizes the exclusive rights of incumbent Transmission Owners by forbidding alteration of the Zones mapped in Attachment J of the Operating Agreement with the exception that "additional Zones may be established if the current boundaries of the PJM Region is expanded to accommodate new Parties to this Agreement."  JA____.

FERC pretends that its orders do nothing unusual, because the "traditional mechanism for establishing the rates for transmission facilities is to use the developer's cost of service," and "merchant transmission facilities" are merely an "additional option[]."  Rehearing Order at P 69, JA___; *accord id.* at P 43, JA____.  That is not so.  FERC's interpretation profoundly changes to the status quo.  Cost-based rates are only "traditional" for incumbent Transmission Owner

utilities that have a legal obligation to serve Native Load Customers within a defined Zone.  Merchant Transmission Owners do not have a regulated revenue requirement and may not charge cost-based rates for the use of their facilities.  *See, e.g.*, CTOA § 1.32, JA____.  FERC improperly erased this distinction.  Moreover, while it is true that the "inclusion of a cost-based economic project does not require the construction of a new rate zone," *see* Rehearing Order at P 62, JA____, FERC omits that every cost-based project in PJM has been built by the zonal Transmission Owner or with its consent on a shared basis.

## B.    FERC Irrationally Interprets the RTEP Protocol in PJM's Operating Agreement to Provide Superior Rights to Non-Contracting Parties

Schedule 6 of the Operating Agreement establishes the RTEP Protocol for planning new transmission facilities, designating who will build them, and allocating their costs.  FERC found that "the language in the RTEP procedures, while ambiguous, does not establish a right of first refusal on behalf of incumbent Transmission Owners and does not preclude a non-incumbent selected in the RTEP process from seeking and receiving cost of service rate recovery under the Federal Power Act."  Rehearing Order at P 35, JA____.  FERC is wrong on both counts.

55

The Operating Agreement preserves the right of incumbent utility Transmission Owners to continue to build projects within their respective Zones, and it does not allow other entities who build economic enhancements as merchant projects to recover regulated return on those facilities through cost-based rates.

FERC's contrary holding rests almost entirely on a single sentence in section 1.5.7(c)(iii) of the RTEP Protocol. In defense of that position, FERC disregards the plain meaning of several key provisions in the RTEP Protocol, or ignores them entirely, to achieve a policy-driven outcome consistent with FERC's contemporaneous decision to eliminate all rights of first refusal in FERC-jurisdictional agreements in the parallel Order No. 1000 rulemaking proceeding.[6] FERC strains to manufacture ambiguity where it does not exist and the ultimate result is an irrational interpretation of the RTEP Protocol that, among other things, would give third-party non-signatories superior rights to existing Transmission Owners.

---

[6]    *See Transmission Planning and Cost Allocation by Transmission Owning and Operating Pub. Utils.*, Order No. 1000, FERC Stats. & Regs. ¶ 31,323 (2011), *order on reh'g*, Order No. 1000-A, 139 FERC ¶ 61,132 (2012), *order on reh'g*, Order No. 1000-B, 141 FERC ¶ 61,044 (2012). Those orders are pending review in *South Carolina Public Service v. FERC*, Case Nos. 12-1232 *et al.* (D.C. Cir. filed May 25, 2012).

1.    **Section 1.5.6(f) Requires PJM to Designate an Incumbent Transmission Owner to Build New Economic Projects in Its Zone**

Section 1.5.6(f) of the RTEP Protocol recognizes that Transmission Owners have a right to build recommended transmission enhancement or expansion projects within their respective Zones and rights-of-way, and provides no mechanism for PJM to disturb that right.  It states:

> For each enhancement or expansion that is included in the recommended plan, the plan shall consider [a number of selection factors] and designate one or more Transmission Owners or other entities to construct, own and, unless otherwise provided, finance the recommended transmission enhancement or expansion.  To the extent that one or more Transmission Owners are designated to construct, own and/or finance a recommended transmission enhancement or expansion, *the recommended plan shall designate the Transmission Owner that owns transmission facilities located in the Zone where the particular enhancement or expansion is to be located*.

RTEP Protocol § 1.5.6(f) (emphasis added), JA____.  The section goes on to say that the plan will define "proportional responsibility" for projects with more than one designated builder—*e.g.*, projects built across multiple Zones—and allows Transmission Owners to agree on joint designations.  *See id.*

In its orders below, FERC offered two reasons to disregard the straightforward mandate that PJM "shall designate the Transmission

Owner that owns transmission facilities located in the Zone where the particular enhancement or expansion is to be located." *Id.* Neither of the spurious reasons FERC gave is a reasonable construction of the Operating Agreement.

First, FERC emphasized that this mandate is qualified such that it only applies "[t]o the extent that one or more *Transmission Owners* are designated to construct" a particular project. *Id.* (emphasis added). Thus, in FERC's view, the mandate "does not provide for reassignment of projects assigned to 'other entities.'" Rehearing Order at P 18 & n.31, JA____ (citing Order, 131 FERC ¶ 61,015 at PP 64-65, JA____); *see, e.g.*, *id.* at P 52 (stating that the mandate does not refer "to economic projects assigned to entities other than incumbent transmission owners"), JA____. FERC's interpretation is irrational because it gives non-Transmission Owner "entities" a superior right to invade a Transmission Owners' zone or right-of-way to build economic projects that no sister Transmission Owner can exercise.

No one contests that section 1.5.6(f) expressly bars an existing Transmission Owner from building projects in another Transmission Owner's Zone without consent. It is unmistakably clear that, when

58

multiple Transmission Owners are involved, PJM must "designate the Transmission Owner that owns transmission facilities located in the Zone where the particular enhancement or expansion is to be located." Yet, if FERC's distinction is correct, third party entities that have no rights or obligations under the Owners Agreement or the Operating Agreement would be able to do precisely what actual Transmission Owners may not do—build economic projects in an existing Transmission Owner's Zone without that Transmission Owner's consent. Moreover, it is not true, as FERC supposes, that the Operating agreement gives PJM authority to grant superior rights "to entities other than incumbent transmission owners." Rehearing Order at P 52, JA____. To the contrary, under section 5.6 of the Owners Agreement, these incumbents retain all rights not specifically transferred.

The illegitimacy of FERC's interpretation is further demonstrated by the irrational phenomenon that, once such an entity actually becomes a Transmission Owner, it immediately loses the right of invasion FERC contemplates because its new status triggers the section 1.5.6(f) mandate that FERC's strained interpretation seeks to circumvent. Petitioners squarely raised this objection below, *see* PSEG

Rehearing at 13 (describing this "erroneous and implausible scenario"), JA____, and FERC acknowledged that argument in its account of the pleadings, *see* Rehearing Order at P 26, JA___.    However, FERC arbitrarily and capriciously ignored this fundamental defect in its interpretation of section 1.5.6(f).    *See* Rehearing Order at PP 50-56, JA___.  That error alone requires remand.  *See, e.g.*, *PSEG Energy*, 665 F.3d at 209-10.

FERC's second theory for disregarding the mandate in section 1.5.6(f) was to contend that it only applies to reliability projects, not to economic projects, because "section 1.5.6(d) specifies that economic enhancements shall be developed in accordance with the procedures described in section 1.5.7, which permits PJM to designate parties other than incumbent Transmission Owners."   Rehearing Order at P 52, JA____.   In FERC's view, the specific mention of economic projects in section 1.5.6(d) somehow limits the scope of section 1.5.6(f) to require only that PJM designate Transmission Owners to build *reliability* projects within their own zone.   That leap is unsupportable.   While section 1.5.6(d) requires PJM to *identify* economic expansions and enhancements in its recommended plan, that does not control PJM's

mandate to *designate* responsibility for projects under 1.5.6(f). Those functions—identification and designation—are different and it is designation, not identification, that is at issue here.

Nothing in section 1.5.6(f) limits its scope to reliability projects. FERC's distinction is artificial and contrary to that section's plain language. The section plainly states that it applies to "*each enhancement or expansion that is included in the recommended plan.*" JA____ (emphasis added). The correct and reasonable reading of section 1.5.6(d)—which avoids nullifying the express scope of section 1.5.6(f)—is that it simply refers the question of whether a project is "economically justified" to "the procedures, criteria and analyses described in Section 1.5.7." JA____. The complex economic analysis set forth at length in section 1.5.7, *see* JA____-____, is the predicate to designation as an economic project under section 1.5.6(f), but does not govern how that designation is made. *See* RTEP Protocol § 1.7(d) (distinguishing between the *designation* of economic facilities and the *development* of such facilities under sections 1.5.6(d) and 1.5.7), JA____.

FERC improperly attempts to support its misinterpretation of section 1.5.6(f) by repeating the bald and erroneous assertion that

section 1.5.7 "permits PJM to designate parties other than incumbent Transmission Owners" to construct economic projects. Rehearing Order at P 52, JA____. As we show in in Parts III.B.3-4, *infra*, section 1.5.7 does not in fact allow that. FERC cannot reasonably assert that it is correct about one disputed issue to dispose of another; that is simply bootstrapping. Moreover, as we next explain, FERC's justification for that leap in paragraph 52 of the Rehearing Order, JA____, is self-defeating.

**2. Section 1.7(d) of the PJM Operating Agreement Acknowledges That Incumbent Transmission Owners Have a Right of First Refusal to Build Economic Transmission Projects**

FERC's Orders fail to examine a key provision in the Operating Agreement—RTEP Protocol section 1.7, which governs a Transmission Owner's Obligation to Build. That omission is fatal because section 1.7(d) unmistakably acknowledges that Transmission Owners may refuse to build economic projects:

> (d) In the event that a Transmission Owner declines to construct an economic transmission enhancement or expansion developed under Sections 1.5.6(d) and 1.5.7 of this Schedule 6 that such Transmission Owner is designated by the Regional Transmission Expansion Plan to construct (in whole or in part), the Office of the Interconnection shall promptly file with the FERC a report on the results of the

> pertinent economic planning process in order to permit the
> FERC to determine what action, if any, it should take.

JA____ (emphasis added). This provision provides a right of refusal limited to Transmission Owners alone that specifically applies to economic upgrades designated by PJM. There is no reason for this provision to exist unless a Transmission Owner is presumptively designated to construct, own, or finance such projects in the first instance.

Petitioners argued to FERC that RTEP Protocol section 1.7 duplicates and reinforces the right of first refusal set forth in sections 4.2.1 and 4.2.2 of the Owners Agreement. *See* PTO Rehearing at PP 25-26 & n.80, JA____-____. We explained that "PJM transmission owners are the only entities that bear the obligation to build reliability-based RTEP projects and the only entities that are subject to specific reporting procedures for declining to construct an economic-based RTEP project." *Id.* at 26. FERC acknowledged that argument when it described our rehearing request. *See* Rehearing Order at P 27 & n.44, JA____. However, FERC never responded to the argument or even mentioned section 1.7 anywhere else in its orders. That omission requires remand. *See, e.g.*, *PSEG Energy*, 665 F.3d at 209-10.

FERC came closest to touching upon this argument when, in defending its interpretation of section 1.5.6, it acknowledged that "incumbent Transmission Owners are under no obligation to build economic projects, and interpreting the RTEP procedures to restrict designations only to incumbent Transmission Owners might result in economic projects not being constructed by anyone." Rehearing Order at P 54, JA____; *cf. id.* at PP 59-60 & n.86, JA____.[7] That hardly advances FERC's case. FERC's scenario contemplates a right of first refusal by incumbent Transmission Owners that occurs prior in time to a refusal by any other "entity," but FERC failed to connect the dots. The fact that Transmission Owners did not give PJM the authority to compel them to build economic projects does not mean that they also ceded to PJM their right of first refusal to build such projects; what they made optional was construction, not designation.

---

[7]    FERC seems to assume that it is inherently wrong not to construct an economic project. That assumption is unexplained and inconsistent with the PJM Agreements. Furthermore, the remedy is already found in section 1.7(d)—if an incumbent Transmission Owner declines to construct an economic enhancement, PJM must file a report and FERC then "determine[s] what action, if any, it should take."

### 3. Section 1.5.7(c)(iii) Does Not Vitiate Incumbent Transmission Owners' Right to Build, or Decline to Build, Economic Projects Within Their Respective Zones

FERC places the entire weight of its holding on an asserted ambiguity in section 1.5.7(c)(iii) of the RTEP Protocol based on the use of the words "entity or entities." That section provides, in relevant part: that:

> [T]he PJM Board shall designate (a) the *entity or entities* that will be responsible for constructing and owning or financing the additional economic-based enhancements and expansions, (b) the estimated costs of such enhancements and expansions, and (c) the market participants that will bear responsibility for the costs of the additional economic-based enhancements and expansions pursuant to section 1.5.6(g) of this Schedule 6.

JA____ (emphasis added). It further provides that PJM must file a report "in accordance with sections 1.6 and 1.7" when "the *entity or entities* designated as responsible for construction, owning or financing a designated new economic-based enhancement or expansion declines to construct, own or finance [it]." JA____ (emphasis added).

FERC erroneously found that section 1.5.7(c)(iii) permits "PJM to designate an entity other than an incumbent transmission owner to build an economic project under cost-based rates." Rehearing Order at

65

P 16, JA____.  On the contrary, there are multiple indications in the text of section 1.5.7(c)(iii)—and still more indications in sections 1.5.6(g), 1.5.7(j), 1.6, and 1.7(d)—that those terms are properly construed in context to mean Transmission Owners.  FERC's expansive construction of "entity or entities" in section 1.5.7(c)(iii) cannot be squared with those other provisions in the RTEP Protocol or like provisions in the Owners Agreement, while Petitioners' interpretation of "entity or entities" in that section to mean Transmission Owners allows all of these provisions to be read together without conflict.

First, section 1.5.7(c)(iii) requires a report "in accordance with sections 1.6 and 1.7" when an "entity or entities designated as responsible for construction [of] a designated new economic-based enhancement or expansion declines to construct [it]."  JA____.  Section 1.7(d) explicitly describes *only* Transmission Owners with regard to reporting requirements and section 1.6(a) treats Transmission Owners synonymously with "entities" by stating in the same sentence that when PJM "designates one or more *Transmission Owners* to construct such expansion or enhancement, [PJM] shall file with FERC a report identifying the expansion or enhancement, its estimated cost, *the entity*

66

*or entities* that will be responsible for constructing and owning or financing the project, and the market participants designated under Section 1.5.6(g) above to bear responsibility for the costs of the project." (emphasis added).

Second, as we explained above, no entity other than a Transmission Owner has an explicit or presumptive obligation to build *any* transmission project approved by PJM.[8]  Therefore, the phrase "entity or entities" in section 1.5.7(c)(iii) must refer to Transmission Owners, because a non-incumbent "entity" has no need to "decline to construct" a project it has no obligation whatsoever to build.  Rather, an incumbent Transmission Owner that declines to construct an economic transmission project creates an opportunity for a non-incumbent to volunteer to become a Transmission Owner.  And, as we next explain, the proper manner for a non-incumbent to volunteer is by offering to provide a "market solution" under 1.5.7(j), not a project supported by cost-based rates.  That interpretation is further supported by the explicit reference to section 1.5.6(g) in section 1.5.7(c)(iii).

---

[8]     Section 4.2.1 of the Owners Agreement and section 1.5.6(f) of the RTEP Protocol do not distinguish between reliability projects and economic projects.

### 4. FERC Erred in Holding That a Non-Incumbent Entity Is Eligible for Cost-Based Rates Under Section 1.5.7(c)(iii)

Section 1.5.7(c)(iii) nowhere states that an "entity or entities" designated to build an economic project is entitled to a regulated rate of return through cost-based rates. FERC wrongly bases a license to grant cost-based recovery on its inaccurate claim that "nothing in section 1.5.7 reserves cost-based projects for incumbent Transmission Owners." Rehearing Order at PP 47, JA___; *see id.* at PP 55-57, JA____. Moreover, that interpretation ignores or nullifies numerous provisions in the Operating Agreement, Owners Agreement, and PJM Tariff that describe merchant transmission facilities and market solutions.

First, section 1.5.7(c)(iii) expressly provides—in the very sentence FERC relies upon—that cost responsibility for economic projects will be *designated* in accordance with section 1.5.6(g). JA____. Section 1.5.6(g) provides in turn that "with respect to any facilities that the Regional Transmission Expansion Plan designates to be owned by an entity other than a Transmission Owner, the plan shall designate that entity as responsible for the costs of such facilities." JA____. That is a flat bar on cost-based rates for any "entity" that is not a zonal Transmission Owner

and it is expressly incorporated into the text of section 1.5.7(c)(iii). FERC's contrary musings in paragraph 56 of the Rehearing Order, JA___, are simply wrong.

FERC's alternate theory is that the phrase "to be owned by an entity other than a Transmission Owner" in section 1.5.6(g) "refers to the future status of the entity when the project is completed." Rehearing Order at P 57, JA___. To illustrate this point, FERC states that "Primary Power, for example, will be a PJM Transmission Owner when its project is constructed and thus is not precluded from being designated to build an economic project under cost of service rates." *Id.* However, that explanation is fatal to FERC's case because it directly conflicts with FERC's theory that an entity like Primary Power is not barred from building in an existing Transmission Owner's Zone under section 1.5.6(f) because it is merely an "entity" and not a Transmission Owner. *See id.* at PP 52-53, JA____. FERC cannot have it both ways.

Second, the path for a non-incumbent transmission developer to become a Transmission Owner through the construction of economic enhancements is clearly set out in section 1.5.7(j), which provides that, "[a]t any time, market participants may submit to [PJM] requests to

69

interconnect Merchant Transmission Facilities or generation facilities pursuant to Part IV of the PJM Tariff that could address an economic constraint." JA____. If PJM "determines that the interconnection of such facilities would relieve an economic constraint, [PJM] may designate the project as a 'market solution' and, in the event of such designation, [section 216] of the PJM Tariff ... shall apply to the project." *Id.*

Petitioners pointed to section 1.5.7(j), like section 1.5.6(g), for the proposition that merchant Transmission Owners are not eligible to construct economic transmission projects and may not charge cost-based rates. *See* PTO Rehearing at 9 & n.35, JA____, 10 & n.40 (specification 1), JA____, 15-16, JA____; PSEG Rehearing at 26-28, JA____-____. FERC did not dispute that position; indeed, FERC repeatedly stated that economic projects cannot be merchant transmission facilities or market solutions under 1.5.7(j). *See* Rehearing Order at PP 47-48; JA____; *id.* at P 54 & n.78, JA____. Despite our violent agreement with FERC, we drew radically different conclusions about what that means. In our view, since PJM's governing agreements only recognize two kinds of Transmission Owners, this left

70

incumbent Transmission Owners as the only remaining "entities" eligible to construct cost-of-service economic projects. In FERC's view, it meant that "the term 'entity' is most reasonably interpreted to apply to a party that is not an incumbent 'Transmission Owner' that is seeking to qualify to build transmission facilities." *Id.* at P 47, JA____.

FERC was not troubled by the fact that the PJM Agreements and Tariff have no home for such "entities" because—paralleling its evasion of section 1.5.6(g)—FERC explained that "[a] non-incumbent transmission developer building transmission facilities will become a PJM Transmission Owner when its facilities go into service." *Id.* at P 47 n.47. Once again, that theory is fatal to FERC's position because it directly conflicts with FERC's proposition that a third-party "entity" escapes section 1.5.6(f) because it is not yet a Transmission Owner. It cannot be simultaneously true that an "entity" may invade an incumbent Transmission Owner's Zone because it *is not* a Transmission Owner yet and also true that an "entity" is eligible to build cost-based economic projects because it *will become* a Transmission Owner.

\*   \*   \*

FERC's orders inflicted an avulsive change to the planning and building of economic transmission projects in PJM.  Not only did it exceed its authority under the FPA, its invention of special rights for transmission developers—who are neither fish nor fowl under PJM's governing agreements—profoundly conflicts with the settled understanding of the actual Parties to the PJM Owners Agreement, including PJM.  FERC was obliged to give presumptive weight to "the parties' assertion of mutual intent."  *Pennzoil Co. v. FERC*, 789 F.2d 1128, 1136 (5th Cir. 1986); *see Pennzoil Co. v. FERC*, 645 F.2d 360, 392 (5th Cir. 1981) ("[I]t is proper to provide a rebuttable presumption in favor of the parties' interpretation as a matter of contract law."); *Associated Gas Distribs. v. FERC*, 810 F.2d 226, 230 (D.C. Cir. 1987) (discussing "what third-party protestors must show to overcome the presumption in favor of the parties' asserted view of their contract").  FERC did not do so because it was easier to pretend to "interpret" the Owners Agreement and RTEP Protocol in response to Primary Power's petition for declaratory order than to make the requisite findings to

change those agreements and the Tariff in response to Central Transmission's complaint under FPA section 206.

FERC's effort to rewrite history lacks merit.  The fact "that FERC accepted the [Owners Agreement and RTEP Protocol] as filed, with the [designation] provision[s] intact, only strengthens the case for enforcing the[m]." *Southern Cal. Edison Co.*, 502 F.3d at 181.

## CONCLUSION

For the reasons set forth above, the petition for review should be granted.

Respectfully submitted,

John Longstreth                  /s/ *John Lee Shepherd, Jr.*
Donald A. Kaplan                 John Lee Shepherd, Jr.
William M. Keyser                Karis Anne Gong
K&L GATES LLP                    SKADDEN, ARPS, SLATE,
1601 K Street                     MEAGHER & FLOM LLP
Washington, DC 20006             1440 New York Avenue, N.W.
(202) 778-9000                   Washington, DC 20005-2111
john.longstreth@klgates.com      (202) 371-7338
don.kaplan@klgates.com           john.shepherd@skadden.com
william.keyser@klgates.com       karis.gong@skadden.com

*Counsel for the PPL Companies*  Jodi L. Moskowitz
                                 General Regulatory Counsel –
Gary E. Guy                      Operations and Compliance
Assistant General Counsel        PSEG SERVICES CORP.
BALTIMORE GAS & ELECTRIC CO.     80 Park Plaza, T-5G
2 Center Plaza, Suite 1301       Newark, NJ 07102
110 West Fayette Street          (973) 430-6409
Baltimore, MD 21201              jodi.moskowitz@pseg.com
(410) 470-1337
gary.e.guy@bge.com               *Counsel for the PSEG Companies*

*On Behalf of Exelon Corporation*

74

## CERTIFICATE AS TO LENGTH OF BRIEF

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure, Circuit Rule 32(a)(2), I hereby certify that the foregoing document contains no more than 14,000 words (13,897 words using the word-count feature in Microsoft Word) not including the tables of contents and authorities, glossary, and certificates of counsel.

Respectfully submitted,

_/s/ John Lee Shepherd, Jr._
John Lee Shepherd, Jr.
SKADDEN, ARPS, SLATE,
 MEAGHER & FLOM LLP
1440 New York Avenue, N.W.
Washington, DC 20005-2111
(202) 371-7338
john.shepherd@skadden.com

January 7, 2013

# CERTIFICATE OF SERVICE

I hereby certify that on January 7, 2013, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Respectfully submitted,

*/s/ John Lee Shepherd, Jr.*
John Lee Shepherd, Jr.
SKADDEN, ARPS, SLATE,
 MEAGHER & FLOM LLP
1440 New York Avenue, N.W.
Washington, DC 20005-2111
(202) 371-7338
john.shepherd@skadden.com

January 7, 2013

# ADDENDUM

Administrative Procedure Act Section 10(e), 5 U.S.C. § 706............... A-1

Federal Power Act Section 201, 16 U.S.C. § 824 ................................... A-2

Federal Power Act Section 202, 16 U.S.C. § 824a ............................... A-6

Federal Power Act Section 203, 16 U.S.C. § 824b ............................. A-10

Federal Power Act Section 205, 16 U.S.C. § 824d ............................ A-13

Federal Power Act Section 206, 16 U.S.C. § 824e.............................. A-17

Federal Power Act Section 210, 16 U.S.C. § 824i .............................. A-21

Federal Power Act Section 211, 16 U.S.C. § 824j .............................. A-24

Federal Power Act Section 216, 16 U.S.C. § 824p ............................. A-28

Federal Power Act Section 313, 16 U.S.C. § 825*l* .............................. A-38

Natural Gas Act Section 7, 15 U.S.C. § 717f..................................... A-40

220 Illinois Compiled Statutes 5/8-406.............................................. A-44

Maryland Code Annotated, Public Utility Companies § 7-207 ......... A-48

New Jersey Statutes Annotated § 40:55D-19.................................... A-54

Ohio Revised Code § 4906.03 ............................................................ A-56

Ohio Revised Code § 4906.04 ............................................................ A-59

52 Pennsylvania Consolidated Statutes § 57.76................................. A-60

## Section 10(e) of the Administrative Procedure Act, 5 U.S.C. § 706 provides:

5 U.S.C. § 706.  Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action.  The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

A-1

**Section 201 of the Federal Power Act, 16 U.S.C. § 824 provides:**

§ 824. Declaration of policy; application of subchapter

(a) Federal regulation of transmission and sale of electric energy

It is declared that the business of transmitting and selling electric energy for ultimate distribution to the public is affected with a public interest, and that Federal regulation of matters relating to generation to the extent provided in this subchapter and subchapter III of this chapter and of that part of such business which consists of the transmission of electric energy in interstate commerce and the sale of such energy at wholesale in interstate commerce is necessary in the public interest, such Federal regulation, however, to extend only to those matters which are not subject to regulation by the States.

(b) Use or sale of electric energy in interstate commerce

(1) The provisions of this subchapter shall apply to the transmission of electric energy in interstate commerce and to the sale of electric energy at wholesale in interstate commerce, but except as provided in paragraph (2) shall not apply to any other sale of electric energy or deprive a State or State commission of its lawful authority now exercised over the exportation of hydroelectric energy which is transmitted across a State line. The Commission shall have jurisdiction over all facilities for such transmission or sale of electric energy, but shall not have jurisdiction, except as specifically provided in this subchapter and subchapter III of this chapter, over facilities used for the generation of electric energy or over facilities used in local distribution or only for the transmission of electric energy in intrastate commerce, or over facilities for the transmission of electric energy consumed wholly by the transmitter.

(2) Notwithstanding subsection (f) of this section, the provisions of sections 824b(a)(2), 824e(e), 824i, 824j, 824j-1, 824k, 824*o*, 824p, 824q, 824r, 824s, 824t, 824u, and 824v of this title shall apply to the entities described in such provisions, and such entities shall be subject to the jurisdiction of the Commission for purposes of carrying out such

A-2

provisions and for purposes of applying the enforcement authorities of this chapter with respect to such provisions. Compliance with any order or rule of the Commission under the provisions of section 824b(a)(2), 824e(e), 824i, 824j, 824j-1, 824k, 824*o*, 824p, 824q, 824r, 824s, 824t, 824u, or 824v of this title, shall not make an electric utility or other entity subject to the jurisdiction of the Commission for any purposes other than the purposes specified in the preceding sentence.

(c) Electric energy in interstate commerce

For the purpose of this subchapter, electric energy shall be held to be transmitted in interstate commerce if transmitted from a State and consumed at any point outside thereof; but only insofar as such transmission takes place within the United States.

(d) "Sale of electric energy at wholesale" defined

The term "sale of electric energy at wholesale" when used in this subchapter, means a sale of electric energy to any person for resale.

(e) "Public utility" defined

The term "public utility" when used in this subchapter and subchapter III of this chapter means any person who owns or operates facilities subject to the jurisdiction of the Commission under this subchapter (other than facilities subject to such jurisdiction solely by reason of section 824e(e), 824e(f), 824i, 824j, 824j-1, 824k, 824*o*, 824p, 824q, 824r, 824s, 824t, 824u, or 824v of this title).

(f) United States, State, political subdivision of a State, or agency or instrumentality thereof exempt

No provision in this subchapter shall apply to, or be deemed to include, the United States, a State or any political subdivision of a State, an electric cooperative that receives financing under the Rural Electrification Act of 1936 (7 U.S.C. 901 et seq.) or that sells less than 4,000,000 megawatt hours of electricity per year, or any agency, authority, or instrumentality of any one or more of the foregoing, or any

corporation which is wholly owned, directly or indirectly, by any one or more of the foregoing, or any officer, agent, or employee of any of the foregoing acting as such in the course of his official duty, unless such provision makes specific reference thereto.

(g) Books and records

(1) Upon written order of a State commission, a State commission may examine the books, accounts, memoranda, contracts, and records of--

(A) an electric utility company subject to its regulatory authority under State law,

(B) any exempt wholesale generator selling energy at wholesale to such electric utility, and

(C) any electric utility company, or holding company thereof, which is an associate company or affiliate of an exempt wholesale generator which sells electric energy to an electric utility company referred to in subparagraph (A),

wherever located, if such examination is required for the effective discharge of the State commission's regulatory responsibilities affecting the provision of electric service.

(2) Where a State commission issues an order pursuant to paragraph (1), the State commission shall not publicly disclose trade secrets or sensitive commercial information.

(3) Any United States district court located in the State in which the State commission referred to in paragraph (1) is located shall have jurisdiction to enforce compliance with this subsection.

(4) Nothing in this section shall--

(A) preempt applicable State law concerning the provision of records and other information; or

A-4

(B) in any way limit rights to obtain records and other information under Federal law, contracts, or otherwise.

(5) As used in this subsection the terms "affiliate", "associate company", "electric utility company", "holding company", "subsidiary company", and "exempt wholesale generator" shall have the same meaning as when used in the Public Utility Holding Company Act of 2005 [42 U.S.C.A. § 16451 et seq.].

**Section 202 of the Federal Power Act, 16 U.S.C. § 824a provides:**

§ 824a. Interconnection and coordination of facilities; emergencies; transmission to foreign countries

(a) Regional districts; establishment; notice to State commissions

For the purpose of assuring an abundant supply of electric energy throughout the United States with the greatest possible economy and with regard to the proper utilization and conservation of natural resources, the Commission is empowered and directed to divide the country into regional districts for the voluntary interconnection and coordination of facilities for the generation, transmission, and sale of electric energy, and it may at any time thereafter, upon its own motion or upon application, make such modifications thereof as in its judgment will promote the public interest. Each such district shall embrace an area which, in the judgment of the Commission, can economically be served by such interconnection and coordinated electric facilities. It shall be the duty of the Commission to promote and encourage such interconnection and coordination within each such district and between such districts. Before establishing any such district and fixing or modifying the boundaries thereof the Commission shall give notice to the State commission of each State situated wholly or in part within such district, and shall afford each such State commission reasonable opportunity to present its views and recommendations, and shall receive and consider such views and recommendations.

(b) Sale or exchange of energy; establishing physical connections

Whenever the Commission, upon application of any State commission or of any person engaged in the transmission or sale of electric energy, and after notice to each State commission and public utility affected and after opportunity for hearing, finds such action necessary or appropriate in the public interest it may by order direct a public utility (if the Commission finds that no undue burden will be placed upon such public utility thereby) to establish physical connection of its transmission facilities with the facilities of one or more other persons engaged in the transmission or sale of electric energy, to sell

A-6

energy to or exchange energy with such persons: *Provided,* That the Commission shall have no authority to compel the enlargement of generating facilities for such purposes, nor to compel such public utility to sell or exchange energy when to do so would impair its ability to render adequate service to its customers. The Commission may prescribe the terms and conditions of the arrangement to be made between the persons affected by any such order, including the apportionment of cost between them and the compensation or reimbursement reasonably due to any of them.

(c) Temporary connection and exchange of facilities during emergency

During the continuance of any war in which the United States is engaged, or whenever the Commission determines that an emergency exists by reason of a sudden increase in the demand for electric energy, or a shortage of electric energy or of facilities for the generation or transmission of electric energy, or of fuel or water for generating facilities, or other causes, the Commission shall have authority, either upon its own motion or upon complaint, with or without notice, hearing, or report, to require by order such temporary connections of facilities and such generation, delivery, interchange, or transmission of electric energy as in its judgment will best meet the emergency and serve the public interest. If the parties affected by such order fail to agree upon the terms of any arrangement between them in carrying out such order, the Commission, after hearing held either before or after such order takes effect, may prescribe by supplemental order such terms as it finds to be just and reasonable, including the compensation or reimbursement which should be paid to or by any such party.

(d) Temporary connection during emergency by persons without jurisdiction of Commission

During the continuance of any emergency requiring immediate action, any person engaged in the transmission or sale of electric energy and not otherwise subject to the jurisdiction of the Commission may make such temporary connections with any public utility subject to the jurisdiction of the Commission or may construct such temporary

facilities for the transmission of electric energy in interstate commerce as may be necessary or appropriate to meet such emergency, and shall not become subject to the jurisdiction of the Commission by reason of such temporary connection or temporary construction: *Provided,* That such temporary connection shall be discontinued or such temporary construction removed or otherwise disposed of upon the termination of such emergency: *Provided further,* That upon approval of the Commission permanent connections for emergency use only may be made hereunder.

(e) Transmission of electric energy to foreign country

After six months from August 26, 1935, no person shall transmit any electric energy from the United States to a foreign country without first having secured an order of the Commission authorizing it to do so. The Commission shall issue such order upon application unless, after opportunity for hearing, it finds that the proposed transmission would impair the sufficiency of electric supply within the United States or would impede or tend to impede the coordination in the public interest of facilities subject to the jurisdiction of the Commission. The Commission may by its order grant such application in whole or in part, with such modifications and upon such terms and conditions as the Commission may find necessary or appropriate, and may from time to time, after opportunity for hearing and for good cause shown, make such supplemental orders in the premises as it may find necessary or appropriate.

(f) Transmission or sale at wholesale of electric energy; regulation

The ownership or operation of facilities for the transmission or sale at wholesale of electric energy which is (a) generated within a State and transmitted from the State across an international boundary and not thereafter transmitted into any other State, or (b) generated in a foreign country and transmitted across an international boundary into a State and not thereafter transmitted into any other State, shall not make a person a public utility subject to regulation as such under other provisions of this subchapter. The State within which any such facilities are located may regulate any such transaction insofar as such State

regulation does not conflict with the exercise of the Commission's powers under or relating to subsection (e) of this section.

(g) Continuance of service

In order to insure continuity of service to customers of public utilities, the Commission shall require, by rule, each public utility to--

(1) report promptly to the Commission and any appropriate State regulatory authorities any anticipated shortage of electric energy or capacity which would affect such utility's capability of serving its wholesale customers,

(2) submit to the Commission, and to any appropriate State regulatory authority, and periodically revise, contingency plans respecting--

(A) shortages of electric energy or capacity, and

(B) circumstances which may result in such shortages, and

(3) accommodate any such shortages or circumstances in a manner which shall--

(A) give due consideration to the public health, safety, and welfare, and

(B) provide that all persons served directly or indirectly by such public utility will be treated, without undue prejudice or disadvantage.

## Section 203 of the Federal Power Act, 16 U.S.C. § 824b provides:

§ 824b. Disposition of property; consolidations; purchase of securities

(a) Authorization

(1) No public utility shall, without first having secured an order of the Commission authorizing it to do so--

(A) sell, lease, or otherwise dispose of the whole of its facilities subject to the jurisdiction of the Commission, or any part thereof of a value in excess of $10,000,000;

(B) merge or consolidate, directly or indirectly, such facilities or any part thereof with those of any other person, by any means whatsoever;

(C) purchase, acquire, or take any security with a value in excess of $ 10,000,000 of any other public utility; or

(D) purchase, lease, or otherwise acquire an existing generation facility--

(i) that has a value in excess of $10,000,000; and

(ii) that is used for interstate wholesale sales and over which the Commission has jurisdiction for ratemaking purposes.

(2) No holding company in a holding company system that includes a transmitting utility or an electric utility shall purchase, acquire, or take any security with a value in excess of $10,000,000 of, or, by any means whatsoever, directly or indirectly, merge or consolidate with, a transmitting utility, an electric utility company, or a holding company in a holding company system that includes a transmitting utility, or an electric utility company, with a value in excess of $10,000,000 without first having secured an order of the Commission authorizing it to do so.

A-10

(3) Upon receipt of an application for such approval the Commission shall give reasonable notice in writing to the Governor and State commission of each of the States in which the physical property affected, or any part thereof, is situated, and to such other persons as it may deem advisable.

(4) After notice and opportunity for hearing, the Commission shall approve the proposed disposition, consolidation, acquisition, or change in control, if it finds that the proposed transaction will be consistent with the public interest, and will not result in cross-subsidization of a non-utility associate company or the pledge or encumbrance of utility assets for the benefit of an associate company, unless the Commission determines that the cross-subsidization, pledge, or encumbrance will be consistent with the public interest.

(5) The Commission shall, by rule, adopt procedures for the expeditious consideration of applications for the approval of dispositions, consolidations, or acquisitions, under this section. Such rules shall identify classes of transactions, or specify criteria for transactions, that normally meet the standards established in paragraph (4). The Commission shall provide expedited review for such transactions. The Commission shall grant or deny any other application for approval of a transaction not later than 180 days after the application is filed. If the Commission does not act within 180 days, such application shall be deemed granted unless the Commission finds, based on good cause, that further consideration is required to determine whether the proposed transaction meets the standards of paragraph (4) and issues an order tolling the time for acting on the application for not more than 180 days, at the end of which additional period the Commission shall grant or deny the application.

(6) For purposes of this subsection, the terms "associate company", "holding company", and "holding company system" have the meaning given those terms in the Public Utility Holding Company Act of 2005 [42 U.S.C. § 16451 et seq.].

A-11

(b) Orders of Commission

The Commission may grant any application for an order under this section in whole or in part and upon such terms and conditions as it finds necessary or appropriate to secure the maintenance of adequate service and the coordination in the public interest of facilities subject to the jurisdiction of the Commission. The Commission may from time to time for good cause shown make such orders supplemental to any order made under this section as it may find necessary or appropriate.

## Section 205 of the Federal Power Act, 16 U.S.C. § 824d provides:

16 U.S.C. § 824d. Rates and charges; schedules; suspension of new rates; automatic adjustment clauses

(a) Just and reasonable rates

All rates and charges made, demanded, or received by any public utility for or in connection with the transmission or sale of electric energy subject to the jurisdiction of the Commission, and all rules and regulations affecting or pertaining to such rates or charges shall be just and reasonable, and any such rate or charge that is not just and reasonable is hereby declared to be unlawful.

(b) Preference or advantage unlawful

No public utility shall, with respect to any transmission or sale subject to the jurisdiction of the Commission, (1) make or grant any undue preference or advantage to any person or subject any person to any undue prejudice or disadvantage, or (2) maintain any unreasonable difference in rates, charges, service, facilities, or in any other respect, either as between localities or as between classes of service.

(c) Schedules

Under such rules and regulations as the Commission may prescribe, every public utility shall file with the Commission, within such time and in such form as the Commission may designate, and shall keep open in convenient form and place for public inspection schedules showing all rates and charges for any transmission or sale subject to the jurisdiction of the Commission, and the classifications, practices, and regulations affecting such rates and charges, together with all contracts which in any manner affect or relate to such rates, charges, classifications, and services.

A-13

(d) Notice required for rate changes

Unless the Commission otherwise orders, no change shall be made by any public utility in any such rate, charge, classification, or service, or in any rule, regulation, or contract relating thereto, except after sixty days' notice to the Commission and to the public. Such notice shall be given by filing with the Commission and keeping open for public inspection new schedules stating plainly the change or changes to be made in the schedule or schedules then in force and the time when the change or changes will go into effect. The Commission, for good cause shown, may allow changes to take effect without requiring the sixty days' notice herein provided for by an order specifying the changes so to be made and the time when they shall take effect and the manner in which they shall be filed and published.

(e) Suspension of new rates; hearings; five-month period

Whenever any such new schedule is filed the Commission shall have authority, either upon complaint or upon its own initiative without complaint, at once, and, if it so orders, without answer or formal pleading by the public utility, but upon reasonable notice, to enter upon a hearing concerning the lawfulness of such rate, charge, classification, or service; and, pending such hearing and the decision thereon, the Commission, upon filing with such schedules and delivering to the public utility affected thereby a statement in writing of its reasons for such suspension, may suspend the operation of such schedule and defer the use of such rate, charge, classification, or service, but not for a longer period than five months beyond the time when it would otherwise go into effect; and after full hearings, either completed before or after the rate, charge, classification, or service goes into effect, the Commission may make such orders with reference thereto as would be proper in a proceeding initiated after it had become effective. If the proceeding has not been concluded and an order made at the expiration of such five months, the proposed change of rate, charge, classification, or service shall go into effect at the end of such period, but in case of a proposed increased rate or charge, the Commission may by order require the interested public utility or public utilities to keep accurate account in detail of all amounts received by reason of such increase,

specifying by whom and in whose behalf such amounts are paid, and upon completion of the hearing and decision may by further order require such public utility or public utilities to refund, with interest, to the persons in whose behalf such amounts were paid, such portion of such increased rates or charges as by its decision shall be found not justified.  At any hearing involving a rate or charge sought to be increased, the burden of proof to show that the increased rate or charge is just and reasonable shall be upon the public utility, and the Commission shall give to the hearing and decision of such questions preference over other questions pending before it and decide the same as speedily as possible.

(f) Review of automatic adjustment clauses and public utility practices; action by Commission; "automatic adjustment clause" defined

(1) Not later than 2 years after November 9, 1978, and not less often than every 4 years thereafter, the Commission shall make a thorough review of automatic adjustment clauses in public utility rate schedules to examine—

(A) whether or not each such clause effectively provides incentives for efficient use of resources (including economical purchase and use of fuel and electric energy), and

(B) whether any such clause reflects any costs other than costs which are—

(i) subject to periodic fluctuations and

(ii) not susceptible to precise determinations in rate cases prior to the time such costs are incurred.

Such review may take place in individual rate proceedings or in generic or other separate proceedings applicable to one or more utilities.

(2) Not less frequently than every 2 years, in rate proceedings or in generic or other separate proceedings, the Commission shall review, with respect to each public utility, practices under any automatic adjustment clauses of such utility to insure efficient use of

A-15

resources (including economical purchase and use of fuel and electric energy) under such clauses.

(3) The Commission may, on its own motion or upon complaint, after an opportunity for an evidentiary hearing, order a public utility to—

(A) modify the terms and provisions of any automatic adjustment clause, or

(B) cease any practice in connection with the clause,

if such clause or practice does not result in the economical purchase and use of fuel, electric energy, or other items, the cost of which is included in any rate schedule under an automatic adjustment clause.

(4) As used in this subsection, the term "automatic adjustment clause" means a provision of a rate schedule which provides for increases or decreases (or both), without prior hearing, in rates reflecting increases or decreases (or both) in costs incurred by an electric utility.  Such term does not include any rate which takes effect subject to refund and subject to a later determination of the appropriate amount of such rate.

## Section 206 of the Federal Power Act, 16 U.S.C. § 824e provides:

16 U.S.C. § 824e.    Power of Commission to fix rates and charges; determination of cost of production or transmission

(a) Unjust or preferential rates, etc.; statement of reasons for changes; hearing; specification of issues

Whenever the Commission, after a hearing held upon its own motion or upon complaint, shall find that any rate, charge, or classification, demanded, observed, charged, or collected by any public utility for any transmission or sale subject to the jurisdiction of the Commission, or that any rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order.  Any complaint or motion of the Commission to initiate a proceeding under this section shall state the change or changes to be made in the rate, charge, classification, rule, regulation, practice, or contract then in force, and the reasons for any proposed change or changes therein.  If, after review of any motion or complaint and answer, the Commission shall decide to hold a hearing, it shall fix by order the time and place of such hearing and shall specify the issues to be adjudicated.

(b) Refund effective date; preferential proceedings; statement of reasons for delay; burden of proof; scope of refund order; refund orders in cases of dilatory behavior; interest

Whenever the Commission institutes a proceeding under this section, the Commission shall establish a refund effective date. In the case of a proceeding instituted on complaint, the refund effective date shall not be earlier than the date of the filing of such complaint nor later than 5 months after the filing of such complaint.  In the case of a proceeding instituted by the Commission on its own motion, the refund effective date shall not be earlier than the date of the publication by the Commission of notice of its intention to initiate such proceeding nor later than 5 months after the publication date.  Upon institution of a

A-17

proceeding under this section, the Commission shall give to the decision of such proceeding the same preference as provided under section 824d of this title and otherwise act as speedily as possible. If no final decision is rendered by the conclusion of the 180-day period commencing upon initiation of a proceeding pursuant to this section, the Commission shall state the reasons why it has failed to do so and shall state its best estimate as to when it reasonably expects to make such decision. In any proceeding under this section, the burden of proof to show that any rate, charge, classification, rule, regulation, practice, or contract is unjust, unreasonable, unduly discriminatory, or preferential shall be upon the Commission or the complainant. At the conclusion of any proceeding under this section, the Commission may order refunds of any amounts paid, for the period subsequent to the refund effective date through a date fifteen months after such refund effective date, in excess of those which would have been paid under the just and reasonable rate, charge, classification, rule, regulation, practice, or contract which the Com-mission orders to be thereafter observed and in force: *Provided*, That if the proceeding is not concluded within fifteen months after the refund effective date and if the Commission determines at the conclusion of the proceeding that the proceeding was not resolved within the fifteen-month period primarily because of dilatory behavior by the public utility, the Commission may order refunds of any or all amounts paid for the period subsequent to the refund effective date and prior to the conclusion of the proceeding. The refunds shall be made, with interest, to those persons who have paid those rates or charges which are the subject of the proceeding.

(c) Refund considerations; shifting costs; reduction in revenues; "electric utility companies" and "registered holding company" defined

Notwithstanding subsection (b) of this section, in a proceeding commenced under this section involving two or more electric utility companies of a registered holding company, refunds which might otherwise be payable under subsection (b) of this section shall not be ordered to the extent that such refunds would result from any portion of a Commission order that (1) requires a decrease in system production or transmission costs to be paid by one or more of such electric companies; and (2) is based upon a determination that the amount of such decrease

should be paid through an increase in the costs to be paid by other electric utility companies of such registered holding company: *Provided*, That refunds, in whole or in part, may be ordered by the Commission if it determines that the registered holding company would not experience any reduction in revenues which results from an inability of an electric utility company of the holding company to recover such increase in costs for the period between the refund effective date and the effective date of the Commission's order. For purposes of this subsection, the terms "electric utility companies" and "registered holding company" shall have the same meanings as provided in the Public Utility Holding Company Act of 1935, as amended.

(d) Investigation of costs

The Commission upon its own motion, or upon the request of any State commission whenever it can do so without prejudice to the efficient and proper conduct of its affairs, may investigate and determine the cost of the production or transmission of electric energy by means of facilities under the jurisdiction of the Commission in cases where the Commission has no authority to establish a rate governing the sale of such energy.

(e) Short-term sales

(1) In this subsection:

(A) The term "short-term sale" means an agreement for the sale of electric energy at wholesale in interstate commerce that is for a period of 31 days or less (excluding monthly contracts subject to automatic renewal).

(B) The term "applicable Commission rule" means a Commission rule applicable to sales at wholesale by public utilities that the Commission determines after notice and comment should also be applicable to entities subject to this subsection.

(2) If an entity described in section 824(f) of this title voluntarily makes a short-term sale of electric energy through an organized market in

which the rates for the sale are established by Commission-approved tariff (rather than by contract) and the sale violates the terms of the tariff or applicable Commission rules in effect at the time of the sale, the entity shall be subject to the refund authority of the Commission under this section with respect to the violation.

(3) This section shall not apply to—

(A) any entity that sells in total (including affiliates of the entity) less than 8,000,000 megawatt hours of electricity per year; or

(B) an electric cooperative.

(4)(A) The Commission shall have refund authority under paragraph (2) with respect to a voluntary short term sale of electric energy by the Bonneville Power Administration only if the sale is at an unjust and unreasonable rate.

(B) The Commission may order a refund under subparagraph (A) only for short-term sales made by the Bonneville Power Administration at rates that are higher than the highest just and reasonable rate charged by any other entity for a short-term sale of electric energy in the same geographic market for the same, or most nearly comparable, period as the sale by the Bonneville Power Administration.

(C) In the case of any Federal power marketing agency or the Tennessee Valley Authority, the Commission shall not assert or exercise any regulatory authority or power under paragraph (2) other than the ordering of refunds to achieve a just and reasonable rate.

**Section 210 of the Federal Power Act, 16 U.S.C. § 824i provides:**

§ 824i. Interconnection authority

(a) Powers of Commission; application by State regulatory authority

(1) Upon application of any electric utility, Federal power marketing agency, geothermal power producer (including a producer which is not an electric utility), qualifying cogenerator, or qualifying small power producer, the Commission may issue an order requiring--

(A) the physical connection of any cogeneration facility, any small power production facility, or the transmission facilities of any electric utility, with the facilities of such applicant,

(B) such action as may be necessary to make effective any physical connection described in subparagraph (A), which physical connection is ineffective for any reason, such as inadequate size, poor maintenance, or physical unreliability,

(C) such sale or exchange of electric energy or other coordination, as may be necessary to carry out the purposes of any order under subparagraph (A) or (B), or

(D) such increase in transmission capacity as may be necessary to carry out the purposes of any order under subparagraph (A) or (B).

(2) Any State regulatory authority may apply to the Commission for an order for any action referred to in subparagraph (A), (B), (C), or (D) of paragraph (1). No such order may be issued by the Commission with respect to a Federal power marketing agency upon application of a State regulatory authority.

(b) Notice, hearing and determination by Commission

Upon receipt of an application under subsection (a) of this section, the Commission shall--

A-21

(1) issue notice to each affected State regulatory authority, each affected electric utility, each affected Federal power marketing agency, each affected owner or operator of a cogeneration facility or of a small power production facility, and to the public.

(2) afford an opportunity for an evidentiary hearing, and

(3) make a determination with respect to the matters referred to in subsection (c) of this section.

(c) Necessary findings

No order may be issued by the Commission under subsection (a) of this section unless the Commission determines that such order--

(1) is in the public interest,

(2) would--

(A) encourage overall conservation of energy or capital,

(B) optimize the efficiency of use of facilities and resources, or

(C) improve the reliability of any electric utility system or Federal power marketing agency to which the order applies, and

(3) meets the requirements of section 824k of this title.

(d) Motion of Commission

The Commission may, on its own motion, after compliance with the requirements of paragraphs (1) and (2) of subsection (b) of this section, issue an order requiring any action described in subsection (a) (1) of this section if the Commission determines that such order meets the requirements of subsection (c) of this section. No such order may be issued upon the Commission's own motion with respect to a Federal power marketing agency.

A-22

(e) Definitions

(1) As used in this section, the term "facilities" means only facilities used for the generation or transmission of electric energy.

(2) With respect to an order issued pursuant to an application of a qualifying cogenerator or qualifying small power producer under subsection (a) (1) of this section, the term "facilities of such applicant" means the qualifying cogeneration facilities or qualifying small power production facilities of the applicant, as specified in the application. With respect to an order issued pursuant to an application under subsection (a) (2) of this section, the term "facilities of such applicant" means the qualifying cogeneration facilities, qualifying small power production facilities, or the transmission facilities of an electric utility, as specified in the application. With respect to an order issued by the Commission on its own motion under subsection (d) of this section, such term means the qualifying cogeneration facilities, qualifying small power production facilities, or the transmission facilities of an electric utility, as specified in the proposed order.

**Section 211 of the Federal Power Act, 16 U.S.C. § 824j provides:**

§ 824j. Wheeling authority

(a) Transmission service by any electric utility; notice, hearing and findings by Commission

Any electric utility, Federal power marketing agency, or any other person generating electric energy for sale for resale, may apply to the Commission for an order under this subsection requiring a transmitting utility to provide transmission services (including any enlargement of transmission capacity necessary to provide such services) to the applicant. Upon receipt of such application, after public notice and notice to each affected State regulatory authority, each affected electric utility, and each affected Federal power marketing agency, and after affording an opportunity for an evidentiary hearing, the Commission may issue such order if it finds that such order meets the requirements of section 824k of this title, and would otherwise be in the public interest. No order may be issued under this subsection unless the applicant has made a request for transmission services to the transmitting utility that would be the subject of such order at least 60 days prior to its filing of an application for such order.

(b) Reliability of electric service

No order may be issued under this section or section 824i of this title if, after giving consideration to consistently applied regional or national reliability standards, guidelines, or criteria, the Commission finds that such order would unreasonably impair the continued reliability of electric systems affected by the order.

(c) Replacement of electric energy

No order may be issued under subsection (a) or (b) of this section which requires the transmitting utility subject to the order to transmit, during any period, an amount of electric energy which replaces any amount of electric energy--

(1) required to be provided to such applicant pursuant to a contract during such period, or

(2) currently provided to the applicant by the utility subject to the order pursuant to a rate schedule on file during such period with the Commission: *Provided,* That nothing in this subparagraph shall prevent an application for an order hereunder to be filed prior to termination or modification of an existing rate schedule: *Provided,* That such order shall not become effective until termination of such rate schedule or the modification becomes effective.

(d) Termination or modification of order; notice, hearing and findings of Commission; contents of order; inclusion in order of terms and conditions agreed upon by parties

(1) Any transmitting utility ordered under subsection (a) or (b) of this section to provide transmission services may apply to the Commission for an order permitting such transmitting utility to cease providing all, or any portion of, such services. After public notice, notice to each affected State regulatory authority, each affected Federal power marketing agency, each affected transmitting utility, and each affected electric utility, and after an opportunity for an evidentiary hearing, the Commission shall issue an order terminating or modifying the order issued under subsection (a) or (b) of this section, if the transmitting utility providing such transmission services has demonstrated, and the Commission has found, that--

(A) due to changed circumstances, the requirements applicable, under this section and section 824k of this title, to the issuance of an order under subsection (a) or (b) of this section are no longer met, or

(B) any transmission capacity of the utility providing transmission services under such order which was, at the time such order was issued, in excess of the capacity necessary to serve its own customers is no longer in excess of the capacity necessary for such purposes, or

A-25

(C) the ordered transmission services require enlargement of transmission capacity and the transmitting utility subject to the order has failed, after making a good faith effort, to obtain the necessary approvals or property rights under applicable Federal, State, and local laws.

No order shall be issued under this subsection pursuant to a finding under subparagraph (A) unless the Commission finds that such order is in the public interest.

(2) Any order issued under this subsection terminating or modifying an order issued under subsection (a) or (b) of this section shall--

(A) provide for any appropriate compensation, and

(B) provide the affected electric utilities adequate opportunity and time to--

(i) make suitable alternative arrangements for any transmission services terminated or modified, and

(ii) insure that the interests of ratepayers of such utilities are adequately protected.

(3) No order may be issued under this subsection terminating or modifying any order issued under subsection (a) or (b) of this section if the order under subsection (a) or (b) of this section includes terms and conditions agreed upon by the parties which--

(A) fix a period during which transmission services are to be provided under the order under subsection (a) or (b) of this section, or

(B) otherwise provide procedures or methods for terminating or modifying such order (including, if appropriate, the return of the transmission capacity when necessary to take into account an increase, after the issuance of such order, in the needs of the transmitting utility subject to such order for transmission capacity).

(e) "Facilities" defined

As used in this section, the term "facilities" means only facilities used for the generation or transmission of electric energy.

## Section 216 of the Federal Power Act, 16 U.S.C. § 824p provides:

§ 824p. Siting of interstate electric transmission facilities

(a) Designation of national interest electric transmission corridors

(1) Not later than 1 year after August 8, 2005, and every 3 years thereafter, the Secretary of Energy (referred to in this section as the "Secretary"), in consultation with affected States, shall conduct a study of electric transmission congestion.

(2) After considering alternatives and recommendations from interested parties (including an opportunity for comment from affected States), the Secretary shall issue a report, based on the study, which may designate any geographic area experiencing electric energy transmission capacity constraints or congestion that adversely affects consumers as a national interest electric transmission corridor.

(3) The Secretary shall conduct the study and issue the report in consultation with any appropriate regional entity referred to in section 824o of this title.

(4) In determining whether to designate a national interest electric transmission corridor under paragraph (2), the Secretary may consider whether--

(A) the economic vitality and development of the corridor, or the end markets served by the corridor, may be constrained by lack of adequate or reasonably priced electricity;

(B)(i) economic growth in the corridor, or the end markets served by the corridor, may be jeopardized by reliance on limited sources of energy; and

(ii) a diversification of supply is warranted;

(C) the energy independence of the United States would be served by the designation;

A-28

(D) the designation would be in the interest of national energy policy; and

(E) the designation would enhance national defense and homeland security.

(b) Construction permit

Except as provided in subsection (i) of this section, the Commission may, after notice and an opportunity for hearing, issue one or more permits for the construction or modification of electric transmission facilities in a national interest electric transmission corridor designated by the Secretary under subsection (a) of this section if the Commission finds that--

(1)(A) a State in which the transmission facilities are to be constructed or modified does not have authority to--

(i) approve the siting of the facilities; or

(ii) consider the interstate benefits expected to be achieved by the proposed construction or modification of transmission facilities in the State;

(B) the applicant for a permit is a transmitting utility under this chapter but does not qualify to apply for a permit or siting approval for the proposed project in a State because the applicant does not serve end-use customers in the State; or

(C) a State commission or other entity that has authority to approve the siting of the facilities has--

(i) withheld approval for more than 1 year after the filing of an application seeking approval pursuant to applicable law or 1 year after the designation of the relevant national interest electric transmission corridor, whichever is later; or

(ii) conditioned its approval in such a manner that the proposed construction or modification will not significantly reduce transmission congestion in interstate commerce or is not economically feasible;

(2) the facilities to be authorized by the permit will be used for the transmission of electric energy in interstate commerce;

(3) the proposed construction or modification is consistent with the public interest;

(4) the proposed construction or modification will significantly reduce transmission congestion in interstate commerce and protects or benefits consumers;

(5) the proposed construction or modification is consistent with sound national energy policy and will enhance energy independence; and

(6) the proposed modification will maximize, to the extent reasonable and economical, the transmission capabilities of existing towers or structures.

(c) Permit applications

(1) Permit applications under subsection (b) of this section shall be made in writing to the Commission.

(2) The Commission shall issue rules specifying--

(A) the form of the application;

(B) the information to be contained in the application; and

(C) the manner of service of notice of the permit application on interested persons.

(d) Comments

In any proceeding before the Commission under subsection (b) of this section, the Commission shall afford each State in which a transmission facility covered by the permit is or will be located, each affected Federal agency and Indian tribe, private property owners, and other interested persons, a reasonable opportunity to present their views and recommendations with respect to the need for and impact of a facility covered by the permit.

(e) Rights-of-way

(1) In the case of a permit under subsection (b) of this section for electric transmission facilities to be located on property other than property owned by the United States or a State, if the permit holder cannot acquire by contract, or is unable to agree with the owner of the property to the compensation to be paid for, the necessary right-of-way to construct or modify the transmission facilities, the permit holder may acquire the right-of-way by the exercise of the right of eminent domain in the district court of the United States for the district in which the property concerned is located, or in the appropriate court of the State in which the property is located.

(2) Any right-of-way acquired under paragraph (1) shall be used exclusively for the construction or modification of electric transmission facilities within a reasonable period of time after the acquisition.

(3) The practice and procedure in any action or proceeding under this subsection in the district court of the United States shall conform as nearly as practicable to the practice and procedure in a similar action or proceeding in the courts of the State in which the property is located.

(4) Nothing in this subsection shall be construed to authorize the use of eminent domain to acquire a right-of-way for any purpose other than the construction, modification, operation, or maintenance of electric transmission facilities and related facilities. The right-of-way cannot be used for any other purpose, and the right-of-way shall terminate upon the termination of the use for which the right-of-way

A-31

was acquired.

(f) Compensation

(1) Any right-of-way acquired pursuant to subsection (e) of this section shall be considered a taking of private property for which just compensation is due.

(2) Just compensation shall be an amount equal to the fair market value (including applicable severance damages) of the property taken on the date of the exercise of eminent domain authority.

(g) State law

Nothing in this section precludes any person from constructing or modifying any transmission facility in accordance with State law.

(h) Coordination of Federal authorizations for transmission facilities

(1) In this subsection:

(A) The term "Federal authorization" means any authorization required under Federal law in order to site a transmission facility.

(B) The term "Federal authorization" includes such permits, special use authorizations, certifications, opinions, or other approvals as may be required under Federal law in order to site a transmission facility.

(2) The Department of Energy shall act as the lead agency for purposes of coordinating all applicable Federal authorizations and related environmental reviews of the facility.

(3) To the maximum extent practicable under applicable Federal law, the Secretary shall coordinate the Federal authorization and review process under this subsection with any Indian tribes, multistate entities, and State agencies that are responsible for conducting any

separate permitting and environmental reviews of the facility, to ensure timely and efficient review and permit decisions.

(4)(A) As head of the lead agency, the Secretary, in consultation with agencies responsible for Federal authorizations and, as appropriate, with Indian tribes, multistate entities, and State agencies that are willing to coordinate their own separate permitting and environmental reviews with the Federal authorization and environmental reviews, shall establish prompt and binding intermediate milestones and ultimate deadlines for the review of, and Federal authorization decisions relating to, the proposed facility.

(B) The Secretary shall ensure that, once an application has been submitted with such data as the Secretary considers necessary, all permit decisions and related environmental reviews under all applicable Federal laws shall be completed--

(i) within 1 year; or

(ii) if a requirement of another provision of Federal law does not permit compliance with clause (i), as soon thereafter as is practicable.

(C) The Secretary shall provide an expeditious pre-application mechanism for prospective applicants to confer with the agencies involved to have each such agency determine and communicate to the prospective applicant not later than 60 days after the prospective applicant submits a request for such information concerning--

(i) the likelihood of approval for a potential facility; and

(ii) key issues of concern to the agencies and public.

(5)(A) As lead agency head, the Secretary, in consultation with the affected agencies, shall prepare a single environmental review document, which shall be used as the basis for all decisions on the proposed project under Federal law.

(B) The Secretary and the heads of other agencies shall streamline the review and permitting of transmission within corridors designated under section 503 of the Federal Land Policy and Management Act (43 U.S.C. 1763) by fully taking into account prior analyses and decisions relating to the corridors.

(C) The document shall include consideration by the relevant agencies of any applicable criteria or other matters as required under applicable law.

(6)(A) If any agency has denied a Federal authorization required for a transmission facility, or has failed to act by the deadline established by the Secretary pursuant to this section for deciding whether to issue the authorization, the applicant or any State in which the facility would be located may file an appeal with the President, who shall, in consultation with the affected agency, review the denial or failure to take action on the pending application.

(B) Based on the overall record and in consultation with the affected agency, the President may--

(i) issue the necessary authorization with any appropriate conditions; or

(ii) deny the application.

(C) The President shall issue a decision not later than 90 days after the date of the filing of the appeal.

(D) In making a decision under this paragraph, the President shall comply with applicable requirements of Federal law, including any requirements of--

(i) the National Forest Management Act of 1976 (16 U.S.C. 472a et seq.);

(ii) the Endangered Species Act of 1973 (16 U.S.C. 1531 et seq.);

A-34

(iii) the Federal Water Pollution Control Act (33 U.S.C. 1251 et seq.);

(iv) the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.); and

(v) the Federal Land Policy and Management Act of 1976 (43 U.S.C. 1701 et seq.).

(7)(A) Not later than 18 months after August 8, 2005, the Secretary shall issue any regulations necessary to implement this subsection.

(B)(i) Not later than 1 year after August 8, 2005, the Secretary and the heads of all Federal agencies with authority to issue Federal authorizations shall enter into a memorandum of understanding to ensure the timely and coordinated review and permitting of electricity transmission facilities.

(ii) Interested Indian tribes, multistate entities, and State agencies may enter the memorandum of understanding.

(C) The head of each Federal agency with authority to issue a Federal authorization shall designate a senior official responsible for, and dedicate sufficient other staff and resources to ensure, full implementation of the regulations and memorandum required under this paragraph.

(8)(A) Each Federal land use authorization for an electricity transmission facility shall be issued--

(i) for a duration, as determined by the Secretary, commensurate with the anticipated use of the facility; and

(ii) with appropriate authority to manage the right-of-way for reliability and environmental protection.

(B) On the expiration of the authorization (including an

authorization issued before August 8, 2005), the authorization shall be reviewed for renewal taking fully into account reliance on such electricity infrastructure, recognizing the importance of the authorization for public health, safety, and economic welfare and as a legitimate use of Federal land.

(9) In exercising the responsibilities under this section, the Secretary shall consult regularly with--

(A) the Federal Energy Regulatory Commission;

(B) electric reliability organizations (including related regional entities) approved by the Commission; and

(C) Transmission Organizations approved by the Commission.

(i) Interstate compacts

(1) The consent of Congress is given for three or more contiguous States to enter into an interstate compact, subject to approval by Congress, establishing regional transmission siting agencies to--

(A) facilitate siting of future electric energy transmission facilities within those States; and

(B) carry out the electric energy transmission siting responsibilities of those States.

(2) The Secretary may provide technical assistance to regional transmission siting agencies established under this subsection.

(3) The regional transmission siting agencies shall have the authority to review, certify, and permit siting of transmission facilities, including facilities in national interest electric transmission corridors (other than facilities on property owned by the United States).

(4) The Commission shall have no authority to issue a permit for the construction or modification of an electric transmission facility

within a State that is a party to a compact, unless the members of the compact are in disagreement and the Secretary makes, after notice and an opportunity for a hearing, the finding described in subsection (b)(1)(C) of this section.

(j) Relationship to other laws

(1) Except as specifically provided, nothing in this section affects any requirement of an environmental law of the United States, including the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.).

(2) Subsection (h)(6) of this section shall not apply to any unit of the National Park System, the National Wildlife Refuge System, the National Wild and Scenic Rivers System, the National Trails System, the National Wilderness Preservation System, or a National Monument.

(k) ERCOT

This section shall not apply within the area referred to in section 824k(k)(2)(A) of this title.

## Section 313 of the Federal Power Act, 16 U.S.C. § 825*l* provides:

16 U.S.C. § 825*l*.  Review of orders

(a) Application for rehearing; time periods; modification of order

Any person, electric utility, State, municipality, or State commission aggrieved by an order issued by the Commission in a proceeding under this chapter to which such person, electric utility, State, municipality, or State commission is a party may apply for a rehearing within thirty days after the issuance of such order.  The application for rehearing shall set forth specifically the ground or grounds upon which such application is based.  Upon such application the Commission shall have power to grant or deny rehearing or to abrogate or modify its order without further hearing. Unless the Commission acts upon the application for rehearing within thirty days after it is filed, such application may be deemed to have been denied. No proceeding to review any order of the Commission shall be brought by any entity unless such entity shall have made application to the Commission for a rehearing thereon.  Until the record in a proceeding shall have been filed in a court of appeals, as provided in subsection (b) of this section, the Commission may at any time, upon reasonable notice and in such manner as it shall deem proper, modify or set aside, in whole or in part, any finding or order made or issued by it under the provisions of this chapter.

(b) Judicial review

Any party to a proceeding under this chapter aggrieved by an order issued by the Commission in such proceeding may obtain a review of such order in the United States court of appeals for any circuit wherein the licensee or public utility to which the order relates is located or has its principal place of business, or in the United States Court of Appeals for the District of Columbia, by filing in such court, within sixty days after the order of the Commission upon the application for rehearing, a written petition praying that the order of the Commission be modified or set aside in whole or in part.  A copy of such petition shall forthwith be transmitted by the clerk of the court to

A-38

any member of the Commission and thereupon the Commission shall file with the court the record upon which the order complained of was entered, as provided in section 2112 of title 28.  Upon the filing of such petition such court shall have jurisdiction, which upon the filing of the record with it shall be exclusive, to affirm, modify, or set aside such order in whole or in part.  No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do.  The finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive.  If any party shall apply to the court for leave to adduce additional evidence, and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for failure to adduce such evidence in the proceedings before the Commission, the court may order such additional evidence to be taken before the Commission and to be adduced upon the hearing in such manner and upon such terms and conditions as to the court may seem proper.  The Commission may modify its findings as to the facts by reason of the additional evidence so taken, and it shall file with the court such modified or new findings which, if supported by substantial evidence, shall be conclusive, and its recommendation, if any, for the modification or setting aside of the original order.  The judgment and decree of the court, affirming, modifying, or setting aside, in whole or in part, any such order of the Commission, shall be final, subject to review by the Supreme Court of the United States upon certiorari or certification as provided in section 1254 of title 28.

(c) Stay of Commission's order

The filing of an application for rehearing under subsection (a) of this section shall not, unless specifically ordered by the Commission, operate as a stay of the Commission's order.  The commencement of proceedings under subsection (b) of this section shall not, unless specifically ordered by the court, operate as a stay of the Commission's order.

**Section 7 of the Natural Gas Act, 15 U.S.C. § 717f provides:**

§ 717f. Construction, extension, or abandonment of facilities

(a) Extension or improvement of facilities on order of court; notice and hearing

Whenever the Commission, after notice and opportunity for hearing, finds such action necessary or desirable in the public interest, it may by order direct a natural-gas company to extend or improve its transportation facilities, to establish physical connection of its transportation facilities with the facilities of, and sell natural gas to, any person or municipality engaged or legally authorized to engage in the local distribution of natural or artificial gas to the public, and for such purpose to extend its transportation facilities to communities immediately adjacent to such facilities or to territory served by such natural-gas company, if the Commission finds that no undue burden will be placed upon such natural-gas company thereby: *Provided,* That the Commission shall have no authority to compel the enlargement of transportation facilities for such purposes, or to compel such natural-gas company to establish physical connection or sell natural gas when to do so would impair its ability to render adequate service to its customers.

(b) Abandonment of facilities or services; approval of Commission

No natural-gas company shall abandon all or any portion of its facilities subject to the jurisdiction of the Commission, or any service rendered by means of such facilities, without the permission and approval of the Commission first had and obtained, after due hearing, and a finding by the Commission that the available supply of natural gas is depleted to the extent that the continuance of service is unwarranted, or that the present or future public convenience or necessity permit such abandonment.

(c) Certificate of public convenience and necessity

**(1)(A)** No natural-gas company or person which will be a natural-

A-40

gas company upon completion of any proposed construction or extension shall engage in the transportation or sale of natural gas, subject to the jurisdiction of the Commission, or undertake the construction or extension of any facilities therefor, or acquire or operate any such facilities or extensions thereof, unless there is in force with respect to such natural-gas company a certificate of public convenience and necessity issued by the Commission authorizing such acts or operations: *Provided, however,* That if any such natural-gas company or predecessor in interest was bona fide engaged in transportation or sale of natural gas, subject to the jurisdiction of the Commission, on February 7, 1942, over the route or routes or within the area for which application is made and has so operated since that time, the Commission shall issue such certificate without requiring further proof that public convenience and necessity will be served by such operation, and without further proceedings, if application for such certificate is made to the Commission within ninety days after February 7, 1942. Pending the determination of any such application, the continuance of such operation shall be lawful.

(B) In all other cases the Commission shall set the matter for hearing and shall give such reasonable notice of the hearing thereon to all interested persons as in its judgment may be necessary under rules and regulations to be prescribed by the Commission; and the application shall be decided in accordance with the procedure provided in subsection (e) of this section and such certificate shall be issued or denied accordingly: *Provided, however,* That the Commission may issue a temporary certificate in cases of emergency, to assure maintenance of adequate service or to serve particular customers, without notice or hearing, pending the determination of an application for a certificate, and may by regulation exempt from the requirements of this section temporary acts or operations for which the issuance of a certificate will not be required in the public interest.

(2) The Commission may issue a certificate of public convenience and necessity to a natural-gas company for the transportation in interstate commerce of natural gas used by any person for one or more high-priority uses, as defined, by rule, by the Commission, in the case of--

A-41

(A) natural gas sold by the producer to such person; and

(B) natural gas produced by such person.

(d) Application for certificate of public convenience and necessity

Application for certificates shall be made in writing to the Commission, be verified under oath, and shall be in such form, contain such information, and notice thereof shall be served upon such interested parties and in such manner as the Commission shall, by regulation, require.

(e) Granting of certificate of public convenience and necessity

Except in the cases governed by the provisos contained in subsection (c) (1) of this section, a certificate shall be issued to any qualified applicant therefor, authorizing the whole or any part of the operation, sale, service, construction, extension, or acquisition covered by the application, if it is found that the applicant is able and willing properly to do the acts and to perform the service proposed and to conform to the provisions of this chapter and the requirements, rules, and regulations of the Commission thereunder, and that the proposed service, sale, operation, construction, extension, or acquisition, to the extent authorized by the certificate, is or will be required by the present or future public convenience and necessity; otherwise such application shall be denied. The Commission shall have the power to attach to the issuance of the certificate and to the exercise of the rights granted thereunder such reasonable terms and conditions as the public convenience and necessity may require.

(f) Determination of service area; jurisdiction of transportation to ultimate consumers

(1) The Commission, after a hearing had upon its own motion or upon application, may determine the service area to which each authorization under this section is to be limited. Within such service area as determined by the Commission a natural-gas company may enlarge or extend its facilities for the purpose of supplying increased

market demands in such service area without further authorization; and

(2) If the Commission has determined a service area pursuant to this subsection, transportation to ultimate consumers in such service area by the holder of such service area determination, even if across State lines, shall be subject to the exclusive jurisdiction of the State commission in the State in which the gas is consumed. This section shall not apply to the transportation of natural gas to another natural gas company.

(g) Certificate of public convenience and necessity for service of area already being served

Nothing contained in this section shall be construed as a limitation upon the power of the Commission to grant certificates of public convenience and necessity for service of an area already being served by another natural-gas company.

(h) Right of eminent domain for construction of pipelines, etc.

When any holder of a certificate of public convenience and necessity cannot acquire by contract, or is unable to agree with the owner of property to the compensation to be paid for, the necessary right-of-way to construct, operate, and maintain a pipe line or pipe lines for the transportation of natural gas, and the necessary land or other property, in addition to right-of-way, for the location of compressor stations, pressure apparatus, or other stations or equipment necessary to the proper operation of such pipe line or pipe lines, it may acquire the same by the exercise of the right of eminent domain in the district court of the United States for the district in which such property may be located, or in the State courts. The practice and procedure in any action or proceeding for that purpose in the district court of the United States shall conform as nearly as may be with the practice and procedure in similar action or proceeding in the courts of the State where the property is situated: *Provided,* That the United States district courts shall only have jurisdiction of cases when the amount claimed by the owner of the property to be condemned exceeds $3,000.

A-43

**220 Illinois Compiled Statutes 5/8-406 provides:**

§ 8-406. Certificate of public convenience and necessity.

(a) No public utility not owning any city or village franchise nor engaged in performing any public service or in furnishing any product or commodity within this State as of July 1, 1921 and not possessing a certificate of public convenience and necessity from the Illinois Commerce Commission, the State Public Utilities Commission or the Public Utilities Commission, at the time this amendatory Act of 1985 goes into effect, shall transact any business in this State until it shall have obtained a certificate from the Commission that public convenience and necessity require the transaction of such business.

(b) No public utility shall begin the construction of any new plant, equipment, property or facility which is not in substitution of any existing plant, equipment, property or facility or any extension or alteration thereof or in addition thereto, unless and until it shall have obtained from the Commission a certificate that public convenience and necessity require such construction. Whenever after a hearing the Commission determines that any new construction or the transaction of any business by a public utility will promote the public convenience and is necessary thereto, it shall have the power to issue certificates of public convenience and necessity. The Commission shall determine that proposed construction will promote the public convenience and necessity only if the utility demonstrates: (1) that the proposed construction is necessary to provide adequate, reliable, and efficient service to its customers and is the least-cost means of satisfying the service needs of its customers or that the proposed construction will promote the development of an effectively competitive electricity market that operates efficiently, is equitable to all customers, and is the least cost means of satisfying those objectives; (2) that the utility is capable of efficiently managing and supervising the construction process and has taken sufficient action to ensure adequate and efficient construction and supervision thereof; and (3) that the utility is capable of financing the proposed construction without significant adverse financial consequences for the utility or its customers.

A-44

(c) After the effective date of this amendatory Act of 1987, no construction shall commence on any new nuclear power plant to be located within this State, and no certificate of public convenience and necessity or other authorization shall be issued therefor by the Commission, until the Director of the Illinois Environmental Protection Agency finds that the United States Government, through its authorized agency, has identified and approved a demonstrable technology or means for the disposal of high level nuclear waste, or until such construction has been specifically approved by a statute enacted by the General Assembly.

As used in this Section, "high level nuclear waste" means those aqueous wastes resulting from the operation of the first cycle of the solvent extraction system or equivalent and the concentrated wastes of the subsequent extraction cycles or equivalent in a facility for reprocessing irradiated reactor fuel and shall include spent fuel assemblies prior to fuel reprocessing.

(d) In making its determination, the Commission shall attach primary weight to the cost or cost savings to the customers of the utility. The Commission may consider any or all factors which will or may affect such cost or cost savings, including the public utility's engineering judgment regarding the materials used for construction.

(e) The Commission may issue a temporary certificate which shall remain in force not to exceed one year in cases of emergency, to assure maintenance of adequate service or to serve particular customers, without notice or hearing, pending the determination of an application for a certificate, and may by regulation exempt from the requirements of this Section temporary acts or operations for which the issuance of a certificate will not be required in the public interest.

A public utility shall not be required to obtain but may apply for and obtain a certificate of public convenience and necessity pursuant to this Section with respect to any matter as to which it has received the authorization or order of the Commission under the Electric Supplier Act, and any such authorization or order granted a public utility by the Commission under that Act shall as between public utilities be deemed

A-45

to be, and shall have except as provided in that Act the same force and effect as, a certificate of public convenience and necessity issued pursuant to this Section.

No electric cooperative shall be made or shall become a party to or shall be entitled to be heard or to otherwise appear or participate in any proceeding initiated under this Section for authorization of power plant construction and as to matters as to which a remedy is available under The Electric Supplier Act.

(f) Such certificates may be altered or modified by the Commission, upon its own motion or upon application by the person or corporation affected. Unless exercised within a period of 2 years from the grant thereof authority conferred by a certificate of convenience and necessity issued by the Commission shall be null and void.

No certificate of public convenience and necessity shall be construed as granting a monopoly or an exclusive privilege, immunity or franchise.

(g) A public utility that undertakes any of the actions described in items (1) through (3) of this subsection (g) or that has obtained approval pursuant to Section 8-406.1 of this Act shall not be required to comply with the requirements of this Section to the extent such requirements otherwise would apply. For purposes of this Section and Section 8-406.1 of this Act, "high voltage electric service line" means an electric line having a design voltage of 100,000 or more. For purposes of this subsection (g), a public utility may do any of the following:

(1) replace or upgrade any existing high voltage electric service line and related facilities, notwithstanding its length;

(2) relocate any existing high voltage electric service line and related facilities, notwithstanding its length, to accommodate construction or expansion of a roadway or other transportation infrastructure; or

A-46

(3) construct a high voltage electric service line and related facilities that is constructed solely to serve a single customer's premises or to provide a generator interconnection to the public utility's transmission system and that will pass under or over the premises owned by the customer or generator to be served or under or over premises for which the customer or generator has secured the necessary right of way.

## Maryland Code Annotated, Public Utility Cos. § 7-207 provides:

§ 7-207. Generating stations or transmission lines -- General certification procedure

(a) Definitions. –

    (1)    (i) In this section and § 7-208 of this subtitle, "construction" means:

        1. any physical change at a site, including fabrication, erection, installation, or demolition; or

        2. the entry into a binding agreement or contractual obligation to purchase equipment exclusively for use in construction in the State or to undertake a program of actual construction in the State which cannot be canceled or modified without substantial loss to the owner or operator of the proposed generating station.

    (ii) "Construction" does not include a change that is needed for the temporary use of a site or route for nonutility purposes or for use in securing geological data, including any boring that is necessary to ascertain foundation conditions.

    (2)    In this section, "qualified generator lead line" means an overhead transmission line that is designed to carry a voltage in excess of 69,000 volts and would allow an out-of-state Tier 1 or Tier 2 renewable source to interconnect with a portion of the electric system in Maryland that is owned by an electric company.

(b) Certificate of public convenience and necessity required. –

    (1)    (i) Unless a certificate of public convenience and necessity for the construction is first obtained from the Commission, a person may not begin construction in the State of:

1. a generating station; or

2. a qualified generator lead line.

(ii) If a person obtains Commission approval for construction under § 7-207.1 of this subtitle, the Commission shall exempt a person from the requirement to obtain a certificate of public convenience and necessity under this section.

(iii) Notwithstanding subparagraph (i) of this paragraph, a person may not apply to obtain a certificate of public convenience and necessity for construction of a qualified generator lead line unless:

1. at least 90 days before the filing of an application for a certificate of public convenience and necessity, the person had in good faith offered the electric company that owns that portion of the electric grid in Maryland to which the qualified generator lead line would interconnect a full and fair opportunity for the electric company to construct the qualified generator lead line; and

2. at any time at least 10 days before the filing of an application for a certificate of public convenience and necessity, the electric company:

A. did not accept from the person a proposal or a negotiated version of the proposal under which the electric company would construct the qualified generator lead line; or

B. stated in writing that the electric company did not intend to construct the qualified generator lead line.

(2) Unless a certificate of public convenience and necessity for the construction is first obtained from the Commission, and

the Commission has found that the capacity is necessary to ensure a sufficient supply of electricity to customers in the State, a person may not exercise a right of condemnation in connection with the construction of a generating station.

(3) (i) Except as provided in paragraph (4) of this subsection, unless a certificate of public convenience and necessity for the construction is first obtained from the Commission, an electric company may not begin construction of an overhead transmission line that is designed to carry a voltage in excess of 69,000 volts or exercise a right of condemnation with the construction.

(ii) For construction related to an existing overhead transmission line, the Commission may waive the requirement in subparagraph (i) of this paragraph for good cause.

(4) (i) Except as provided in subparagraph (ii) of this paragraph, for construction related to an existing overhead transmission line designed to carry a voltage in excess of 69,000 volts, the Commission shall waive the requirement to obtain a certificate of public convenience and necessity if the Commission finds that the construction does not:

1. require the electric company to obtain new real property or additional rights-of-way through eminent domain; or

2. require larger or higher structures to accommodate:

A. increased voltage; or

B. larger conductors.

(ii) 1. For construction related to an existing overhead transmission line, including repairs, that is necessary to avoid an imminent safety hazard or reliability risk, an electric company may undertake the necessary construction.

A-50

      2. Within 30 days after construction is completed under subsubparagraph 1 of this subparagraph, an electric company shall file a report with the Commission describing the work that was completed.

(c) Notice to interested persons. –

    (1)    On receipt of an application for a certificate of public convenience and necessity under this section, the Commission shall provide notice to the Department of Planning and to all other interested persons.

    (2)    The Department of Planning shall forward the application to each appropriate State unit and unit of local government for review, evaluation, and comment regarding the significance of the proposal to State, area-wide, and local plans or programs.

(d) Public hearing. –

    (1)    The Commission shall provide an opportunity for public comment and hold a public hearing on the application for a certificate of public convenience and necessity in each county and municipal corporation in which any portion of the construction of a generating station, an overhead transmission line designed to carry a voltage in excess of 69,000 volts, or a qualified generator lead line is proposed to be located.

    (2)    The Commission shall hold the public hearing jointly with the governing body of the county or municipal corporation in which any portion of the construction of the generating station, overhead transmission line, or qualified generator lead line is proposed to be located, unless the governing body declines to participate in the hearing.

(3)   Once in each of the 4 successive weeks immediately before the hearing date, the Commission shall provide weekly notice of the public hearing and an opportunity for public comment by advertisement in a newspaper of general circulation in the county or municipal corporation affected by the application.

(4)   (i) The Commission shall ensure presentation and recommendations from each interested State unit, and shall allow representatives of each State unit to sit during hearing of all parties.

(ii) The Commission shall allow each State unit 15 days after the conclusion of the hearing to modify the State unit's initial recommendations.

(e)   Final action by Commission. -- The Commission shall take final action on an application for a certificate of public convenience and necessity only after due consideration of:

(1)   the recommendation of the governing body of each county or municipal corporation in which any portion of the construction of the generating station, overhead transmission line, or qualified generator lead line is proposed to be located; and

(2)   the effect of the generating station, overhead transmission line, or qualified generator lead line on:

(i) the stability and reliability of the electric system;

(ii) economics;

(iii) esthetics;

(iv) historic sites;

(v) aviation safety as determined by the Maryland Aviation

Administration and the administrator of the Federal Aviation Administration;

(vi) when applicable, air and water pollution; and

(vii) the availability of means for the required timely disposal of wastes produced by any generating station.

(f)  Construction of overhead transmission lines. -- For the construction of an overhead transmission line, in addition to the considerations listed in subsection (e) of this section, the Commission shall take final action on an application for a certificate of public convenience and necessity only after due consideration of the need to meet existing and future demand for electric service.

(g)  Transmission lines near airport runway. –

(1)    The Commission may not authorize, and an electric company may not undertake, the construction of an overhead transmission line that is aligned with and within 1 mile of either end of a public airport runway, unless:

(i) the Federal Aviation Administration determines that the construction of an overhead transmission line will not constitute a hazard to air navigation; and

(ii) the Maryland Aviation Administration concurs in that determination.

(2)    A privately owned airport runway shall qualify as a public airport runway under this subsection only if the runway has been on file with the Federal Aviation Administration for at least 2 years as being open to the public without restriction.

**New Jersey Statutes Annotated § 40:55D-19 provides:**

40:55D-19. Appeal or petition in certain cases to the Board of Public Utilities

If a public utility, as defined in R.S.48:2-13, or an electric power generator, as defined in section 3 of P.L.1999, c. 23 (C.48:3-51), is aggrieved by the action of a municipal agency through said agency's exercise of its powers under this act, with respect to any action in which the public utility or electric power generator has an interest, an appeal to the Board of Public Utilities of the State of New Jersey may be taken within 35 days after such action without appeal to the municipal governing body pursuant to section 8 of this act unless such public utility or electric power generator so chooses. In such case appeal to the Board of Public Utilities may be taken within 35 days after action by the governing body. A hearing on the appeal of a public utility to the Board of Public Utilities shall be had on notice to the agency from which the appeal is taken and to all parties primarily concerned, all of whom shall be afforded an opportunity to be heard. If, after such hearing, the Board of Public Utilities shall find that the present or proposed use by the public utility or electric power generator of the land described in the petition is necessary for the service, convenience or welfare of the public, including, but not limited to, in the case of an electric power generator, a finding by the board that the present or proposed use of the land is necessary to maintain reliable electric or natural gas supply service for the general public and that no alternative site or sites are reasonably available to achieve an equivalent public benefit, the public utility or electric power generator may proceed in accordance with such decision of the Board of Public Utilities, any ordinance or regulation made under the authority of this act notwithstanding.

This act or any ordinance or regulation made under authority thereof, shall not apply to a development proposed by a public utility for installation in more than one municipality for the furnishing of service, if upon a petition of the public utility, the Board of Public Utilities shall after hearing, of which any municipalities affected shall have notice, decide the proposed installation of the development in question is reasonably necessary for the service, convenience or welfare of the

A-54

public.

Nothing in this act shall be construed to restrict the right of any interested party to obtain a review of the action of the municipal agency or of the Board of Public Utilities by any court of competent jurisdiction according to law.

**Ohio Revised Code § 4906.03 provides:**

4906.03 Powers and duties of power siting board.

The power siting board shall:

(A) Require such information from persons subject to its jurisdiction as it considers necessary to assist in the conduct of hearings and any investigations or studies it may undertake;

(B) Conduct any studies or investigations that it considers necessary or appropriate to carry out its responsibilities under this chapter;

(C) Adopt rules establishing criteria for evaluating the effects on environmental values of proposed and alternative sites, and projected needs for electric power, and such other rules as are necessary and convenient to implement this chapter, including rules governing application fees, supplemental application fees, and other reasonable fees to be paid by persons subject to the board's jurisdiction. The board shall make an annual accounting of its collection and use of these fees and shall issue an annual report of its accounting, in the form and manner prescribed by its rules, not later than the last day of June of the year following the calendar year to which the report applies.

(D) Approve , disapprove, or modify and approve applications for certificates;

(E) Notwithstanding sections 4906.06 to 4906.14 of the Revised Code, the board may adopt rules to provide for an accelerated review of an application for a construction certificate for construction of a major utility facility related to a coal research and development project as defined in section 1555.01 of the Revised Code, or to a coal development project as defined in section 1551.30 of the Revised Code, submitted to the Ohio coal development office for review under division (B)(7) of section 1551.33 of the Revised Code. Applications for construction certificates for construction of major utility facilities for Ohio coal research and development shall be filed with the board on the same day

A-56

as the proposed facility or project is submitted to the Ohio coal development office for review.

The board shall render a decision on an application for a construction certificate within ninety days after receipt of the application and all of the data and information it may require from the applicant. In rendering a decision on an application for a construction certificate, the board shall only consider the criteria and make the findings and determinations set forth in divisions (A)(2), (3), (5), and (7) and division (B) of section 4906.10 of the Revised Code.

(F) Notwithstanding sections 4906.06 to 4906.14 of the Revised Code, the board shall adopt rules to provide for an accelerated review of an application for a construction certificate for any of the following:

(1) An electric transmission line that is:

(a) Not more than two miles in length;

(b) Primarily needed to attract or meet the requirements of a specific customer or specific customers;

(c) Necessary to maintain reliable electric service as a result of the retirement or shutdown of an electric generating facility located within the state; or

(d) A rebuilding of an existing transmission line.

(2) An electric generating facility that uses waste heat or natural gas and is primarily within the current boundary of an existing industrial or electric generating facility;

(3) A gas pipeline that is not more than five miles in length or is primarily needed to meet the requirements of a specific customer or specific customers.

The board shall adopt rules that provide for the automatic certification to any entity described in this division when an application by any such entity is not suspended by the board, an administrative law judge, or the chairperson or executive director of the board for good

A-57

cause shown, within ninety days of submission of the application. If an application is suspended, the board shall approve, disapprove, or modify and approve the application not later than ninety days after the date of the suspension.

**Ohio Revised Code § 4906.04 provides:**

4906.04 Certificate required for construction of major utility.


    No person shall commence to construct a major utility facility in this state without first having obtained a certificate for the facility. The replacement of an existing facility with a like facility, as determined by the power siting board, shall not constitute construction of a major utility facility. Such replacement of a like facility is not exempt from any other requirements of state or local laws or regulations. Any facility, with respect to which such a certificate is required, shall thereafter be constructed, operated, and maintained in conformity with such certificate and any terms, conditions, and modifications contained therein. A certificate may only be issued pursuant to Chapter 4906. of the Revised Code. A certificate may be transferred, subject to the approval of the board, to a person who agrees to comply with the terms, conditions, and modifications contained therein.

**52 Pennsylvania Consolidated Statutes § 57.76 provides:**

§ 57.76. Determination and order.

(a) The Commission will issue its order, with its opinion, if any, either granting or denying the application, in whole or in part, as filed or upon the terms, conditions or modifications, of the location, construction, operation or maintenance of the line as the Commission may deem appropriate. The Commission will not grant the application, either as proposed or as modified, unless it finds and determines as to the proposed HV line:

(1) That there is a need for it.

(2) That it will not create an unreasonable risk of danger to the health and safety of the public.

(3) That it is in compliance with applicable statutes and regulations providing for the protection of the natural resources of this Commonwealth.

(4) That it will have minimum adverse environmental impact, considering the electric power needs of the public, the state of available technology and the available alternatives.

(b) A Commission order granting a siting application will be deemed to include a grant of authority, subject to the provisions of law, to locate and construct the proposed HV transmission line within a corridor consisting of the area of 500 feet on each side of the centerline of the proposed HV transmission line unless the applicant requests and the Commission approves a corridor of a different size. A proposed HV transmission line may not be constructed outside the corridor, except upon petition to and approval by the Commission.